THE MESABA-CLIFFS MINING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 12754. Promulgated June 3, 1948.

*Theodore R. Colborn, Esq.*, for petitioner.
*Clarence E. Price, Esq.*, for the respondent.

### OPINION.

LeMire, *Judge*: This proceeding involves a deficiency of $122,692.62 in excess profits tax for 1941. The petitioner concedes liability for $604.05 of that amount. The contested portion of the deficiency results from the respondent's disallowance of an excess profits credit carryover for 1940.

The parties have filed a written stipulation of facts reading, in material part, as follows:

1. The Petitioner is a Minnesota corporation, with principal office at 1460 Union Commerce Building, Cleveland, Ohio. The return for the period here involved was filed with the Collector for the Eighteenth District of Ohio, at Cleveland, Ohio.

\* \* \* \* \* \* \*

4. The Petitioner was incorporated under the laws of Minnesota on June 27, 1929 and in April, 1932 was reorganized as a consolidation of three corporations owning and operating open pit iron ore mines in Minnesota. Its entire authorized and issued common stock at the time of such reorganization and at all times since consisted of 40,000 shares of common stock of the par value of $100 per share.

At the time of its reorganization such stock was owned by the following corporations in the following amounts and proportions:

| Owner of Stock | No. of Shares | Percentage of Total |
|---|---|---|
| The Cleveland-Cliffs Iron Company | 9280 | 23. 2% |
| Pittsburgh Steel Company | 6400 | 16. 0 |
| Wheeling Steel Corporation | 6080 | 15. 2 |
| Inland Steel Company | 5680 | 14. 2 |
| Hanna Iron Ore Company | 4280 | 10. 7 |
| Republic Steel Corporation | 3600 | 9. 0 |
| Jones & Laughlin Steel Corporation | 2880 | 7. 2 |
| Otis Steel Company | 1800 | 4. 5 |
|  | 40000 | 100. 0% |

Each of these corporations continued to own such stock from such time until the present, except that on June 30, 1942 Jones & Laughlin Steel Corporation acquired and now owns all of the assets of Otis Steel Company, including the 1800 shares of Petitioner's stock.

5. The Cleveland-Cliffs Iron Company is engaged primarily in the production and sale of iron ore, the sale of coal, and the transportation of iron ore and coal by vessel. Hanna Iron Ore Company is a subsidiary of National Steel Corporation, engaged in the production and sale of iron ore. All of the other stockholders of the Petitioner, and National Steel Corporation, are engaged in the production of steel and steel products. The statements in this paragraph have been true at all times since 1932.

6. The business and affairs of the Petitioner at all times since 1932 have been controlled by its Board of Directors, consisting of 16 individuals, representing the Petitioner's stockholders substantially in proportion to their stockholdings as hereinabove set forth.

7. Since 1932 the officers of the Petitioner have consisted of individuals holding similar offices with The Cleveland-Cliffs Iron Company, and in addition of three Vice-Presidents who have been officers of Pittsburgh Steel Company, Wheeling Steel Company, and Inland Steel Company. Also since 1932 the actual day to day operations of the Petitioner have been supervised by The Cleveland-Cliffs Iron Company, subject to the Petitioner's Board of Directors, in consideration of the payment by the Petitioner to such company of a management fee.

8. The Petitioner was organized primarily for the purpose of mining iron ore and selling such iron ore to its stockholders. Its by-laws at all times since 1933 have provided that each of its stockholders shall purchase from it such proportion of the ore mined by it each year as the stock held by each bears to the entire outstanding stock of the Petitioner, at such price as the Petitioner's Board of Directors shall from time to time determine. The Petitioner's by-laws have also provided that the tonnage of ore to be produced each year shall be determined at a meeting of the stockholders held for such purpose.

9. In each year commencing with 1932 the ore mined by the Petitioner has been sold to its stockholders substantially in proportion to their stockholdings. Until December 31, 1940 such ore was sold by Petitioner and paid for by its stockholders at a price equal to the cost to the Petitioner of such ore as determined by its accountants, pursuant to action duly taken by the Petitioner's Board of Directors. During such period Petitioner's net income or deficit in net income was in such amount only as resulted from variations between the determinations of such cost employed in fixing the amounts charged by the Petitioner for its ore and the amounts finally determined.

10. Pursuant to action duly taken by its Board of Directors on June 24, 1941, the Petitioner, during the year 1941, sold iron ore to its stockholders as in prior years, substantially in proportion to their stockholdings, at a price for Hill Bessemer ore of $4.41 per gross ton, f. o. b. Lake Erie ports, and for ore of the McCook grade of $4.11 per gross ton, f. o. b. Lake Erie ports. These prices were in excess of the actual cost to the Petitioner of such ore, and not more than the fair market value thereof.

11. During the years 1940 and 1941 the Petitioner did not change its method of accounting.

12. For the year 1940, the petitioner's books of record show the following: computed under the law applicable to taxable years beginning in 1940, its net income was $45,446.40, its income tax was $10,907.13, its excess profits net income computed under the invested capital method was $34,539.27, and its excess profits credit, based on invested capital, was $304,979.86; and computed under the law applicable to taxable years beginning in 1941, its excess profits net income computed under the invested capital method was $45,446.40, its excess profits credit based on invested capital was $304,979.86 and it had an unused excess profits credit of $259,533.46.

13. For the year 1941 the Petitioner's books of record show that its net income was $549,842.77, its excess profits net income computed under the invested capital method was $542,902.39, and its excess profits credit was $276,643.08.

The petitioner's excess profits credit for 1941, as shown in the deficiency notice, was $276,643.08, based on an equity invested capital of $3,458,038.47.

The respondent's position is that the taxpayer is not, or was not in 1941, such a corporation as Congress intended should be entitled to the excess profits tax relief provided for in the unused excess profits credit carry-over provisions of section 710 of the Internal Revenue Code.

The statute in question provides, in section 710 (a) (1), that:

\* \* \* There shall be levied, collected, and paid, for each taxable year, upon the adjusted excess-profits net income, as defined in subsection (b), of every corporation (except a corporation exempt under section 727) a tax equal to whichever of the following amounts is the lesser: \* \* \*

The adjusted excess profits net income is defined in subsection (b) as the excess profits net income (as defined in section 711), minus the sum of:

(1) A specific exemption of $10,000;
(2) The amount of the excess profits credit allowed under section 712; and
(3) The amount of the unused excess profits credit adjustment for the taxable year, computed in accordance with subsection (c).

Subsection (c) provides, in so far as herein material, as follows:

(c) UNUSED EXCESS PROFITS CREDIT ADJUSTMENT.—

(1) COMPUTATION OF UNUSED EXCESS PROFITS CREDIT ADJUSTMENT.—The unused excess profits credit adjustment for any taxable year shall be the aggregate of the unused excess profits credit carry-overs and unused excess profits credit carry-backs to such taxable year.

(2) DEFINITION OF UNUSED EXCESS PROFITS CREDIT.—The term "unused excess profits credit" means the excess, if any, of the excess profits credit for any taxable year beginning after December 31, 1939, over the excess profits net income for

such taxable year, computed on the basis of the excess profits credit applicable to such taxable year. For such purpose the excess profits credit and the excess profits net income for any taxable year beginning in 1940 shall be computed under the law applicable to taxable years beginning in 1941. * * *

The parties have stipulated that the petitioner had an unused excess profits credit carry-over from 1940 of $259,533.46. Unquestionably, petitioner would be entitled to the use of that credit in computing its 1941 excess profits net income if the excess profits provisions of the statute are to be given general application to all corporations, as the petitioner contends they should. However, we held in *Wier Long Leaf Lumber Co.*, 9 T. C. 990, that those provisions are not to be so construed, but that the facts of each case must be examined to determine whether the conditions which Congress sought to relieve actually obtain. We had under consideration in that case a "carry-back" from 1943 and 1944 to 1942 of an unused excess profits credit under section 710 (c) (3) (A) instead of, as in the instant case, a "carry-over" under section 710 (c) (3) (B). We held that the taxpayer there was not entitled to the carry-back claimed, because of the fact that it was in the process of liquidation in 1943 and 1944 and was not operating normally, for profit, in those years. We said that it was obvious that:

* * * the excess profits tax credit carry-back was intended by Congress to benefit only corporations which had been in active production throughout the war period and which had projected their activities to "peacetime years." The amendment was surely not adopted to permit a corporation during wartime years to cease all productive activity and obtain a substantial profit at the expense of the Federal revenue for doing nothing. Such an interpretation would permit a needless and unreasonable diversion of wartime revenue, would promote inflation, and would not assist reconversion to peacetime economy.

We think that the principle of that case should apply here. The petitioner was organized and was operated until 1941 as what might be termed a nonprofit corporation. It is stipulated that during such period it sold its ore to its corporate stockholders at cost, or endeavored to do so, and that its net income, if any, resulted from miscalculations of such cost. Had the petitioner continued to operate at cost there would, of course, never have arisen any question of excess profits credit carry-over, or even excess profits. The obvious reason for petitioner's change of policy in 1941, as the petitioner explains in its brief, was to take advantage of the invested capital credit provisions of the statute. With the petitioner operating at cost, it is said, the profits from its operations would have been passed on to its stockholders in the form of lower prices for their ore and the stockholders would have received no benefit, in the computation of their excess profits tax, on account of petitioner's invested capital.

There can be no question but that the petitioner was within its rights in adjusting its business operations to the tax advantage of its stockholders. The respondent has made no objection to that action. In the

computation appearing in the deficiency notice he has allowed the petitioner full excess profits credit of $276,643.08 (8 per cent of an equity invested capital of $3,458,038.47) for the current year 1941. He objects only to the allowance of the additional excess profits credit carry-over of $353,140.25 from 1940 when the petitioner was operating as a nonprofit corporation. Such, he argues, could not be the purpose of the statute.

The legislative history of the excess profits provisions of the statute throws some light on this question. As to the particular relief provisions here involved, the report of the Senate Finance Committee states:

> The bill affords relief in the following situations:
> 1. It relieves the hardships which may be caused by the sharply fluctuating earnings of many types of companies, the activities of which are dependent upon business cycles, by allowing unused excess-profits credits to be carried over into the two succeeding taxable years, thereby tending to level off the unusual effects due to rise and fall of income. In addition, the allowance of such an excess profits credit carry-over will be of substantial benefit to new corporations, and to old corporations undergoing a period of expansion.

See Senate Finance Committee Report No. 75, 77th Cong., 1st sess. (C. B. 1941-1, pp. 550-551). None of the conditions referred to in the committee reports are to be found here. There was no fluctuation of petitioner's earnings dependent upon business cycles. The fluctuation, if such it could be called, between petitioner's 1940 and 1941 earnings was the result of a voluntary change of policy. The petitioner's earnings were at all times subject to control by its stockholders. These stockholders determined not only the price, but also the quantity of the ore which they were to purchase from the petitioner. It could hardly have been the purpose of Congress to "level off" the effects of the rise and fall of a controlled income, such as was the petitioner's. The petitioner was somewhat in the position of a "new corporation" in 1941, that being the first year of its operation as a profit-making business, but as such its first year for claiming the benefits of an excess profits credit carry-over would be 1942.

The petitioner states in its brief that:

> The obvious purpose of the credit carry-over provisions is to accomplish an averaging* of the income subject to excess profits tax during the excess profits tax period. * * *
>
> *For obvious administrative reasons Congress did not attempt to average out the effect of varying excess profits tax rates in the different years.

It is inconceivable, however, that Congress intended to include in the averaging of the excess profits tax a year in which the taxpayer did not have and, under its plan of operation, did not intend to have any profits.

We think that the statutory provisions under consideration should

be construed as making the excess profits credit carry-over, as well as the carry-back, available only to those taxpayers who during both the taxable period and the preceding or succeeding periods have maintained a normal going business, devoted substantially to the production of profits. No other construction would be consonant with the manifest purpose of the statute.

In the circumstances of this case we think the respondent was justified in denying the taxpayer the benefit of the carry-over excess profits credit for the taxable year 1941.

Reviewed by the Court.

*Decision will be entered for the respondent.*