**EASTERN GRAIN ELEVATOR CORP. v. McGOWAN, Collector of Internal Revenue.**

Civ. A. No. 4503.

United States District Court
W. D. New York.
Nov. 9, 1950.

David S. Jackson, Buffalo, N. Y., for plaintiff.

Theron Lamar Caudle, Asst. Atty. Gen., Andrew D. Sharpe and J. W. Hussey, Sp. Assts. to Atty. Gen., George L. Grobe, U. S. Atty., Buffalo, N. Y., for defendant.

KNIGHT, Chief Judge.

The plaintiff, Eastern Grain Elevator Corporation, had been engaged in the merchandising of grain, and the ownership and operation of grain elevators at the Port of Buffalo, New York, for many years prior to 1945. In the latter part of 1944 it had reduced its elevator holdings to a single elevator, The Concrete Central, so-called, which had a capacity of four million bushels of grain.

On November 27, 1944, plaintiff entered into a contract with the Continental Grain Company for the sale of the Concrete Central Elevator, lands and buildings for $770,000. A second contract was made the same day providing for certain operating adjustments due to the large amount of grain then in the elevator. Legal title to the elevator property was transferred on December 27, 1944, and on the following day the stockholders adopted a resolution providing for a liquidation of the corporation within a year and took action looking to such dissolution.

On December 28, 1944, the capital and surplus of the corporation was $2,315,209.- 74, and on that day there was paid to the stockholders a liquidating distribution of $1,200,000, this being $6.00 on 200,000 shares. After this distribution plaintiff had $68,411.09 cash on hand; $950,000 in Government bonds; and $96,798.65 in accounts receivable.

This action is brought to recover an assessment against the plaintiff for an alleged deficiency in excess profit taxes for the year 1944, in the amount of $20,861.65. This had been paid under protest.

Section 710(c) (3) (A) of the Internal Revenue Code, 26 U.S.C.A. § 710(c) (3) (A), reads: "Unused excess profits credit carry-back. If for any taxable year beginning after December 31, 1941, the taxpayer has an unused excess profits credit, such unused excess profits credit shall be an unused excess profits credit carry-back for each of the two preceding taxable years, except that the carry-back in the case of the first preceding taxable year shall be the excess, if any, of the amount of such unused excess profits credit over the adjusted excess profits net income for the second preceding taxable year computed for such taxable year (i) by determining the unused excess profits credit adjustment without regard to such unused excess profits credit, and (ii) without the deduction of the specific exemption provided in subsection (b) (1)."

(b) (1) gives a definition of Adjusted Excess Profits Net Income as the excess profits net income, with certain exemptions.

Plaintiff claims that its liquidation period extended from January 1, 1945, to December 3, 1945, and that it is entitled to the benefits of the unused excess profits credit carry-back provisions of the above quoted section of the Internal Revenue Act during such liquidation. The question is whether such section applies to a corporation while liquidating. Only a question of law is presented.

■ It has repeatedly been held that a corporation does not cease to exist because it "has * * * ceased to carry on the business for which it was chartered." Lucas v. Swan, 4 Cir., 67 F.2d 106, 109, 90 A.L.R. 210. "The existence of a corporation, however, does not terminate until it is legally dissolved in accordance with the law of its creation." Commissioner of Internal Revenue v. Allegheny Broadcasting Corp., 3 Cir., 179 F.2d 844, 846; Wier Long Leaf Lumber Co. v. Commissioner of Internal Revenue, 5 Cir., 173 F.2d 549. Jaffee v. Commissioner of Internal Revenue, 2 Cir., 45 F.2d 679; United States v. Garfunkel, D.C., 52 F.2d 727; Metropolitan Telephone & Telegraph Co. v. Metropolitan Tel. & Tel. Co., 156 App.Div. 577, 141 N.Y.S. 598; Fletcher CYC Corporations, Vol. 16, secs. 7999 and 8013; Brock v. Poor, 216 N.Y. 387, 111 N.E. 229; Sec. 29.52-1 of Reg. 111; Sec. 105, N.Y. Stock Corporation Law, McK.Consol.Laws, c. 59.

Defendant asserts that under no state of facts, while a company is liquidating, can it be allowed an excess profits credit to carry-back in reduction of its excess profits taxes in an operating year. Rather it claims that the corporation having ceased operations in 1944, having instituted proceedings looking to dissolution procedure, and being in a liquid financial position, was no longer a corporation serving a real corporate purpose and that it must be treated as de facto dissolved at the end of 1944. As was said in the Wier case, supra: " * * * if it appears that the corporation is a corporation in name and semblance only, without corporate substance and serving no real corporate purpose, it must, though not formally dissolved, be treated as dissolved de facto."

But it, also, said in the same case "that the fact of liquidation and the particular circumstances and stages of it are relevant to the inquiry here, and that they may, indeed must, be inquired into." [173 F.2d 551.]

So here inquiry must be made into the activities in which the plaintiff engaged during any liquidation.

The sale included land and elevator, certain other buildings and structures, fixtures, machinery, and all personal property used in connection with the elevator.

The second, or supplemental contract, concerned the adjustment of elevator grain storage and conditioning charges; weighing up of the grain; insurance, customers' bonds; outside contracts and obligations of the seller and other minor matters.

At the time of the sale, 2,495,539 bushels of grain were in storage. Included in this grain was a considerable amount in store for the account of the Commodity Credit Corporation, an agency of the United States. Making these adjustments required the services of a considerable number of employees beside certain of the officers about a month in time. The grain had to be checked and weighed.

On or shortly after December 28, 1944, the plaintiff mailed to the Secretary of State for New York its certificate of dissolution. This could not be filed by the Secretary until the consent of the State Tax Commission was obtained. Under Section 105 of the Stock Corporation Law N.Y., a corporation may be dissolved by filing a certificate of dissolution with the Secretary, with the proviso that it should not be filed by him unless the consent of the Tax Commission is first obtained. On the issuance of the certificate, a duplicate is filed with the County Clerk. The consent of the State Tax Commission was withheld until plaintiff submitted its 1944 franchise tax return and the proposed return for the period from January 1, 1945, to December, 1945, the proposed period for dissolution. The Commission further required submission of further information regarding the results of audits of all prior Federal income tax returns of the corpora-

tion, the filing of the certificate of dissolution and the issuance of the certificate of filing by the Secretary of State. The certificate of dissolution and the issuance of the certificate showing such filing did not issue till April 18, 1945. Then the plaintiff, by virtue of the Stock Corporation Law was required to publish in a newspaper a copy of the certificate of dissolution with a notice requiring all creditors and claimants to present their claims not later than June 15, 1945. By April 5, 1945, plaintiff's income tax return for the calendar year 1944 had been prepared and filed, and the first installment shown due paid. The New York State franchise tax of $46,287.82 had also been determined and paid. All accounts between plaintiff and Continental Grain Company and Commodity Credit Corporation had been settled; all surety bond liability adjusted; all exchange memberships, save one, had been sold; all outstanding warehouse, save two, receipts surrendered and cancelled. This work in these and other matters required a very considerable time and effort.

Shortly after the expiration of the time for filing claims, and on June 28, 1945, a further liquidation distribution was made of $3.00 per share to the total of $600,000. The plaintiff's balance sheet showed, after deducting $600,000 for dividends, $143,988.90. At that time all of plaintiff's accounts had been settled, and its miscellaneous assets disposed of.

On June 28, 1945, the dissolution proceedings were practically ready for the wind up. Only three matters remained unended: (1) The tax adjustment bill of 1945 had not become effective, and this concerned the right of corporations to post-war refunds and carry-back credits; (2) setting up a fund by the stockholders against liability of unknown claimants; and (3) declaration of a final dividend of the $143,998.90. Provisions for the adjustment of all of these matters could have been made on or prior to June 28, 1945.

Plaintiff's Minute Book is in evidence, and a more detailed account of the activities of the plaintiff during dissolution is set out in it.

The excess profits tax, Sec. 710 et seq., was added to the Internal Revenue Code by Section 201 of the Revenue Act of 1940. No carry-back was provided for until the enactment of Section 204(b) of the Act of 1942. Two methods of determining the excess profits were allowed: one by an averaging of the income actually realized in operations for a four-year "baseperiod" immediately prior to 1940; the other provided for a credit for normal income of 8% of the corporation's equity invested in capital, if the total invested capital was less than $5,000,000. The provisions related to any unused balance of such credits at the end of a given year were added to the Code by Section 2(b) of the amendment of 1941, but authorized only a carry-over of an unused credit for the two succeeding years. A carry-back was first authorized by Section 204 of the Act of 1942. The plaintiff adopted the invested capital method.

Whether a corporation in liquidation is entitled to any benefits under the provisions of Sec. 710(c) (3) (A) must depend on the nature and extent of its activities. Numerous authorities, however, have recognized that such benefits are given under circumstances fairly comparable with those in this case. It cannot be said here that "it must be considered 'de facto' liquidated" and dissolved for tax purposes at the end of the year (1945 meaning, deft. br.). While it then had practically reached a "liquid financial" condition, necessary matters of major importance had thereafter to be closed up.

Wier Long Leaf Lumber Co. v. Commissioner of Internal Revenue, supra, presented specially comparable facts with this case. Petitioner had operated a lumber mill for some years prior to December 19, 1942, when the directors voted to liquidate. It then made liquid distribution of $1,030,000 and sold its mill and no longer made money as an active saw mill company. It carried into 1943 assets of more than $900,000. It made several liquidating distributions in 1943, and continued in liquidation in 1944. The Circuit Court reversed the Commissioner, saying that it was not in agreement in its holding "that a corporation in

liquidation cannot be held to be a corporation within the meaning of Sec. 710." This liquidation continued for nearly two years. This case was decided in 1949.

In Bowman v. Glenn, D.C., 84 F.Supp. 200, 201, the question was whether plaintiff took too long in liquidation which continued from October, 1944, until August, 1945. It was held that it was not too long a time. There it was contended that the relief provided by Section 710 was intended "only to those taxpayers whose activities were continued throughout the war years and the ensuing years of peace." It was held that this was not the law. This case cited the Wier case, and it also said: "In the subsequent case of Mesaba-Cliffs Mining Co. v. Commissioner of Internal Revenue, 10 T.C. 1010, the tax court approved its holding in the Wier Long Leaf Lumber case * * *."

Mesaba-Cliffs Mining Co. v. Commissioner of Internal Revenue, supra; was affirmed by the Sixth Circuit, 174 F.2d 857. This case involved facts not present in the case at bar. There was no liquidation. Its importance here lies in its like construction of Section 710, supra, with that in the Wier case.

In O'Sullivan Rubber Co. v. Commissioner of Internal Revenue, 42 B.T.A. 721, affirmed 2 Cir., 120 F.2d 845, petitioner filed a certificate of dissolution, sold its business and ceased doing business. The consideration for the business involved payments extending over several years. It continued in liquidation for 3 years. Its income was derived from the installment payments and interest. The Commissioner imposed a penalty for failing to file a return as a corporation. He urged that when it had dissolved and was carrying on no business there could be no association taxable as a corporation within the statute and regulation. The Board of Tax Appeals reversed. It said that Sec. 801(a) (2) includes "associations" in the term "corporation," and further that "article 801-2 of Regulations 86 (provides) that a corporation becomes an association if it continues to conduct its affairs after the expiration of its charter or after the termination of

its existence". It held, however, that neither the statute nor the regulation was necessary to bring the taxpayer within the term "corporation", saying "This was not a trust but an actual corporation. The law of New York provides that after dissolution 'Such corporation shall continue for the purpose of paying, satisfying and discharging any existing liabilities or obligations, collecting and distributing its assets and doing all other acts required to adjust and wind up its business and affairs, and may sue and be sued in its corporate name.' Sec. 105, Stock Corporation Law of New York. * * * Thus, the petitioner was continued under the law as a corporation for the very purpose of doing these things which it did in 1935. * * *".

On appeal in this Circuit, the court upheld the decision of the Tax Court of Appeals, and, in part, said: "Under the law of New York, the state of its creation, a corporation which has filed a certificate of dissolution 'shall continue', for stated purposes including the collection of assets, the payment of obligations, and other acts required to terminate its affairs and business. These are corporate purposes, contemplated as such from the birth of the corporation; the declining years of a corporation are part of its life; and it would be a strange doctrine that the fulfillment of those corporate purposes, which might, and did here, require a considerable stretch of time, is beyond the reach of a tax statute as broad in its scope as Section 351(b) (1)." [120 F.2d 847.]

This language fits the case at bar. See: Mrs. Grant Smith v. C.I.R., 26 B.T.A. 1178; Elgin Compress Co. v. C.I.R., 31 B.T.A. 273; Hellebush v. Commissioner of Internal Revenue, 24 B.T.A. 660, affirmed 6 Cir., 65 F.2d 902; Northwest Utilities Securities Corp. v. Commissioner of Internal Revenue, 8 Cir., 67 F.2d 619.

Though they do not show comparable facts, in Union Bus Terminal, Inc., v. Commissioner of Internal Revenue, 12 T.C. 197, and Commissioner of Internal Revenue v. Allegheny Broadcasting Corp., 3 Cir., 179 F.2d 844, the carry-back provision is there

recognized as applicable to a corporation in liquidation.

Sec. 2922(a)-20 of Regulations 111 provides: "*Gross income of corporation in liquidation.* When a corporation is dissolved, its affairs are usually wound up by a receiver or trustees in dissolution. The corporate existence is continued for the purpose of liquidating the assets and paying the debts, and such receiver or trustees stand in the stead of the corporation for such purposes."

Here is a clear recognition of the authority of a corporation to continue in existence for the purpose of "liquidating the assets and paying the debts" while non-operating. Again, the authority of trustees or receivers to continue in office for the purpose of closing up the affairs of corporation after the corporation has ceased operation is shown.

In Winter & Co., Inc., v. Commissioner of Internal Revenue, 13 T.C. 108 on which the defendant lays much stress, the facts do not compare with those in the case at bar.

Sears, Roebuck & Co. was sole stockholder of Winter & Co., Inc., an Indiana Corporation. Sears also owned the stock of Winter & Company, a New York Corporation, the parent company. The New York Corporation had been engaged in manufacturing pianos. Petitioner's business was the assembling and finishing of pianos. The pianos, assembled by this petitioner, were sold by the New York Company. Sales accounts of pianos were collected by the New York Company, and credited to petitioner. Books of account of petitioner were kept in the office of the New York Company. Sears, the New York Company, and Retwin Corporation made an agreement whereby Sears sold stock of petitioner to the New York Company and sold the stock of the latter to Retwin Corporation. Dividends were declared and credited to Sears by petitioner and the New York Company of all their surplus and earnings, so that these companies had no surplus or earnings.

Petitioner used up its inventory together with all its plant equipment; had no employees; did not engage in any manufacturing and had no expenses. It was intended to resume business after governmental restrictions had been removed. Petitioner operated as a department, only, of the parent company.

The opinion states that "If a corporation to which the provision for such credit is applicable should discontinue its operating functions after the lapse of a month, a year, or two years, within such applicable period, we think it inconceivable that Congress intended that the excess profits credit was to apply not only to the operating years, but also to each of the remaining nonoperating years of the maximum authorized cycle." But the opinion also says: "The effectuation of the provisions for tax relief purposes and the prevention of its abuse for tax avoidance beyond the relief intended require of necessity that the period of tax years over which the carry-over or carry-back can be made shall embrace only a period of business operations or of operations to effect a conversion or liquidation thereof. * * * This case presents a unique factual situation."

We see here the recognition that tax relief may be given during liquidation. The court seeks to distinguish the Mesaba-Cliffs, Kingman, Wier, Union Bus and Allegheny cases. Referring to the Wier case, it is said: "The above quoted excerpt from the Wier case (p. 551, pars. 1, 2, 3) is authority for our holding on the facts in the instant case that, notwithstanding the petitioner here retained its legal existence, it was, for the purpose of excess profits taxes, de facto dissolved as of April 30, 1942, and that the period February 1 to April 30, 1942, inclusive, was a short taxable year. The quoted excerpt is also authority for our holding that there can be no carry-back to 1942 of the unused excess profits for the year 1944."

The court also, in this Winter case, in distinguishing it from cases where functioning continues during liquidation said: "* * * as the Mesaba case, or a corporaton whose functioning as such had continued pending liquidation in the year from which it was sought to carry-back unused excess profits credit."

The court also said: "* * * petitioner's action and function as a corporate entity was and is entirely dictated and controlled by its parent." There was no reason why the parent company could not have taken over all intangible assets.

The defendant says that "The Senate Committee's Report on the Revenue Bill of 1945, S.Rep. No. 655, 79th Cong., 1st Session, p. 30; 1945 Cum.Bull. 6210, showed that the Congress felt that no express prohibition against the allowance of excess profits credit carry-backs under extraordinary circumstances would be required." This unquestionably was the intent to insure against "abuses which might arise through various devices * * *."

Defendant also quotes from the Wier case, in part, as follows: "The amendment (1942) was surely not adopted to permit a corporation during wartime years to cease all productive activity and obtain a substantial profit at the expense of the Federal revenue for doing nothing. Such an interpretation would permit a needless and unreasonable diversion of wartime revenue, would promote inflation, and would not assist reconversion to peacetime economy."

Defendant also says that the Tax Court in the Winter case pointed out that even on the theory on which the Wier case was decided that theory would support the decision in Winter. We agree with that, but none the less, that does not affect the rule relative to the liquidation period as shown in Wier and the present case.

■ As was hereinbefore shown, plaintiff's liquidation period, on June 28, 1945, had progressed to that point where it was ended, save for certain matters that could then have been arranged to be included in a plan of liquidation as of that date. For that reason the liquidation period to which the plaintiff is entitled to the benefits of the unused excess profits credits for a carry-back under the provisions of Section 710(c) (3) (A) of the Internal Revenue Code is limited to a period of six months from January 1, 1945. Any further extension of the period would be within the condemnation of and not within the purposes of the statute.

■ The computation of the excess profits credit carry-back is left to the computation of the parties who will report to the Court. The Court can then make the proper direction.

Attached hereto and submitted herewith marked Exhibits 1, 2, 3 and 4 are statements from the books of plaintiff showing assets and liabilities as of December 27, 1944, as of February 3, 1945; as of March 31, 1945, and as of June 27, 1945.

Findings may be submitted to accord herewith.

Ex. 1

December 27, 1944.

| | | |
|---|---|---|
| Cash in Banks | $480,489.96 | |
| Checks from Continental Grain Co. | 17,921.13) | |
| | 770,000.00) | $1,268,411.09 |
| Accounts Receivable | | 96,798.65 |
| Government Securities | | 950,000.00 |
| | | $2,315,209.74 |
| Accounts Payable (Estimated) | $ 5,000.00 | |
| Severance Pay | 35,532.62 | |
| Robertson Contract Balance | 16,012.00 | |
| Federal & State Taxes (Estimated) | 425,000.00 | |
| | | $ 481,544.62 |
| | | $1,833,665.12 |

February 3, 1945.　　　　　　　　Ex. 2

ASSETS:

| | |
|---|---:|
| Cash | $159,834.61 |
| U/S Treasury Bonds & Tax Savings Notes at market | 909,750.00 |
| Accounts Receivable | 28,633.01 |
| Accrued Interest | 2,122.25 |
| Post War Refund of Excess Profits Tax | 15,463.43 |
| Memberships (Estimated Value) | 6,950.00 |
| Office Furniture (Book Value) | 792.31 |

　　　　　　　　　　　　　　　　　　　　　　　$1,123,545.61

LIABILITIES:

| | |
|---|---:|
| Accounts Payable | 3,785.13 |
| Reserve for State Franchise Tax | 46,434.82 |
| Reserve for Federal Taxes | 327,791.31 |

　　　　　　　　　　　　　　　　　　　　$　378,011.26

BALANCE:　　　　　　　　　　　　$　745,534.35

Ex. 3

March 31, 1945.

| ASSETS: | | | LIABILITIES & CAPITAL: | |
|---|---:|---|---|---:|
| Accrued Interest | $ 4,288.91 | | Reserve for C&P Insurance | $ 1,609.30 |
| Accounts Receivable | 1,246.78 | | Reserve for Old Age Pension | 573.43 |
| Cash | 129,585.68 | | Reserve for Unemployment Insurance | 860.13 |
| c/o Party Insurance | 47.92 | | | |
| Memberships | 3,300.00 | | Reserve for 20% Tax | 592.36 |
| Office Furniture | 452.92 | | Reserve for Income Tax | 245,490.19 |
| U/S Bonds | 650,000.00 | | | |
| Tax Savings Notes | 180,000.00 | | Net Worth | 735,272.50 |
| Post War Refund | 15,475.70 | | | |
| | $984,397.91 | | | $984,397.91 |

Ex. 4

June 27, 1945.

| ASSETS: | | | LIABILITIES & CAPITAL: | |
|---|---:|---|---|---:|
| Cash | $ 76,533.78 | | Reserve for Taxes | $163,748.96 |
| Accounts Receivable | 264.68 | | | |
| Accrued Interest | 541.65 | | Net Worth | 743,988.90 |
| Office Furniture (Depreciated Value) | 422.05 | | | |
| $650,000 U/S Bonds @ 103. (x) | 669,500.00 | | | |
| Tax Saving Notes | 145,000.00 | | | |
| Post War Refund | 15,475.70 | | | |
| | $907,737.86 | | | $907,737.86 |