HUNTER MANUFACTURING CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 31381. Promulgated December 31, 1953.

---

*Ralph W. Barbier, Esq.*, for the petitioner.
*Jules I. Whitman, Esq.*, for the respondent.

**428**

OPINION.

LeMire, *Judge:* The primary question presented is whether the loss sustained by petitioner in 1946, as a result of the worthlessness of the capital stock of MUSA, is an ordinary loss within the purview of section 23 (g) (4), as contended by the petitioner, or a capital loss under section 23 (g) (2), as determined by the respondent.

The respondent contends that 76 per cent of the capital stock of MUSA owned by the petitioner was worthless prior to the petitioner's acquisition, for a nominal amount, of the remaining 24 per cent on July 15, 1946; that the purchase of the minority interest served no business purpose and was motivated solely for tax-reducing purposes, and, hence, the purported affiliation was not an affiliation within the intendment of section 23 (g) (4) of the Code.

The petitioner contends that the evidence establishes that all of the conditions prescribed have been met to bring it within the statutory definition of an affiliate; that as no holding period is provided for, none may be implied; and, since the minority shares were legally acquired, no business purpose need be shown.

While a taxpayer has the legal right to decrease the amount of what would otherwise be his taxes, or altogether avoid them by means which the law permits (*Gregory* v. *Helvering*, 293 U. S. 465, 469), since the substance and not the form controls, the realities of the transaction may be examined in order to determine whether a transaction is a mere formality without substance which may be disregarded for tax purposes. *Higgins* v. *Smith*, 308 U. S. 473, and *Bazley* v. *Commissioner*, 331 U. S. 737.

Section 23 (g) [1] deals with capital losses and limits the amount of the loss resulting from the sale or exchange of capital assets. Sub-

---

[1] SEC. 23. DEDUCTIONS FROM INCOME.
In computing net income there shall be allowed as deductions:
(g) CAPITAL LOSSES.—
(1) LIMITATION.—Losses from sales or exchanges of capital assets shall be allowed only to the extent provided in section 117.
(2) SECURITIES BECOMING WORTHLESS.—If any securities (as defined in paragraph (3) of this subsection) become worthless during the taxable year and are capital assets,

division (4) of this section creates an exception to the general rule and provides that the capital stock of an affiliate, as defined in the act, shall not be deemed a capital asset.

Subsection (4) of section 23 (g) was added by section 123 of the Revenue Act of 1942.[2]

Assuming the petitioner has met all the conditions prescribed to constitute its subsidiary an affiliate, as defined in the act, we think it does not necessarily follow that it is entitled to the benefits the statute confers. The general rule is that the strict letter of the act must yield to its evident spirit and purpose when this is necessary to give effect to the intent of Congress, and that unjust and absurd consequences are, if possible, to be avoided. *Fleischmann Co.* v. *United States*, 270 U. S. 349, 360.

To apply the strict letter of the statute as contended for by the petitioner would, under the facts disclosed by this record, lead to an unjust and unreasonable result that could not have been intended by Congress. The impartial mind rebels against the notion that Congress intended to permit such a facile and obvious opportunity to avoid or escape taxation.

The petitioner organized MUSA as a Mexican corporation in 1945. During the period January 1945 to February 1946, it acquired approximately 76 per cent of its authorized and issued capital stock at a cost of $155,463.93. Prior to July 1936 it advanced funds to MUSA in the amount of approximately $180,000. On July 15, 1946, the petitioner filed a statement with the taxing authorities for the purpose of extending the time for the payment of taxes. It therein stated that it expected to sustain a loss of approximately $150,000 on its open account with MUSA, in the amount of $185,000,[3] and that the most optimistic estimate of recoupment in a liquidation would be a maximum of $35,000. It further stated that an additional large sum would

the loss resulting therefrom shall, for the purposes of this chapter, be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets.

(3) DEFINITION OF SECURITIES.—As used in this paragraph (2) of this subsection the term "securities" means (A) shares of stock in a corporation, and (B) rights to subscribe for or to receive such shares.

(4) STOCK IN AFFILIATED CORPORATION.—For the purposes of paragraph (2) stock in a corporation affiliated with the taxpayer shall not be deemed a capital asset. For the purposes of this paragraph a corporation shall be deemed to be affiliated with the taxpayer only if:

(A) at least 95 per centum of each class of its stock is owned directly by the taxpayer; and

(B) more than 90 per centum of the aggregate of its gross incomes for all taxable years has been from sources other than royalties, rents (except rents derived from rental of properties to employees of the company in the ordinary course of its operating business), dividends, interest (except interest received on deferred purchase price of operating assets sold), annuities, or gains from sales or exchanges of stocks and securities; and

(C) the taxpayer is a domestic corporation.

[2] S. Rept. No. 1631, 77th Cong., 2d Sess., p. 89, and Conf. Rept. No. 2586, 77th Cong., 2d Sess., p. 39.

[3] The amount was stipulated to be $180,000.

have to be invested to make MUSA a paying proposition; that petitioner had no funds available for that purpose; and that the Mexican group is not inclined to pay any more into it. Since the petitioner had determined that it was about to sustain a very considerable loss as a creditor, it had knowledge that its stock investment was then valueless. MUSA had, since its organization, operated at a loss and upon the sale of its assets it recovered approximately $26,000, which was applied to reduce the indebtedness of MUSA to petitioner. Relying solely upon the book value of its fixed assets, as shown on the balance sheet of MUSA as of June 30, 1946, the petitioner argues that stock of MUSA had value. However, the record is devoid of any evidence as to the fair market value of the fixed assets on the critical date in question. In the light of the facts above set forth, we think it is obvious that the stock of MUSA was worthless prior to the acquisition of the 24 per cent minority interest to constitute MUSA an affiliate within the definition set forth in section 23(g)(4) of the Code. No purpose would be served here by discussing the maze of cases involving deductions for losses from stock becoming worthless. The worthlessness here is determined only for the purpose of its bearing on the motive for the acquisition of the minority interests.

The record shows that prior to July 15, 1946, the petitioner obtained legal and accounting advice and was well aware that, in order to secure a tax benefit from losses on its investment in the capital stock of MUSA, it would be necessary to acquire sufficient shares to increase its holdings to 95 per cent of the outstanding stock so as to qualify its loss as an ordinary loss rather than a capital loss. Very soon after Charles E. Hunter, the petitioner's president, arrived in Mexico City, Mexico, he instituted negotiations for the purchase of the minority interests and acquired the remaining 4,750 shares for $2,536.08. The petitioner then owned all of the capital stock. A special meeting of the shareholders was held in Mexico City on July 20, 1946, at which it was voted to dissolve. Hunter was appointed liquidator and he sold all of the physical assets of MUSA to an individual purchaser.

The petitioner argues that if it is necessary to establish that the 24 per cent minority interest was acquired for a business purpose, the fact that the acquisition of the additional shares enabled it to liquidate its subsidiary promptly and without possible interference from minority stockholders establishes such a purpose. Since petitioner already owned 76 per cent of the outstanding shares it was in control, and we think such argument is without substance. In view of the financial condition of MUSA any interference from dissident stockholders appears to be an unwarranted assumption.

This record, as we view it, contains no evidence to support a business purpose in the acquisition of the minority interest but rather con-

clusively establishes the contrary. There is no indication that the petitioner had any plan or bona fide intention to reorganize or rehabilitate the subsidiary with a purpose of continuing the business. The realities of the situation here disclosed show that such a contingency was not a reasonable probability.

In our opinion, the only reasonable inference to be drawn from this record is that the additional 24 per cent of the outstanding stock of MUSA was acquired solely for tax-reducing purposes. We find no merit in the petitioner's contention that since the statute provides no period of time during which the 95 per cent stock interest is to be held to qualify it as an affiliate, none may be implied. We think the absence of a fixed holding period is of no significance. Congress was well aware of the doctrine in *Gregory* v. *Helvering, supra,* and cognate cases. As stated by Judge Learned Hand in *Commissioner* v. *Transport Trad. & Term. Corp.,* 176 F. 2d 570, the doctrine of *Gregory* v. *Helvering:*

means that in construing words of a tax statute which describe commercial or industrial transactions we are to understand them to refer to transactions entered upon for commercial or industrial purposes and not to include transactions entered upon for no other motive but to escape taxation. * * *

Congress, in enacting section 23 (g) (4) of the Code, undoubtedly had in mind a true affiliation which would serve a business purpose.

Research has revealed no decision where the business purpose rule has been applied to section 23 (g) (4) of the Code. The rule was applied by this Court in the case of *J. D. & A. B. Spreckels,* 41 B. T. A. 370, which involved the construction of section 141 of the Code granting the privilege of an affiliated group to file consolidated returns. Although the *Spreckels* case pertained to another section of the Code, the issue involved is analogous to that presented in the instant case and, we think, its rationale is applicable here.

We hold that the affiliation effected under the facts and circumstances disclosed by this record is not the kind of affiliation that the statute had in mind. We, therefore, sustain the respondent's determination that the loss sustained by the petitioner in the year 1946, as a result of the worthlessness of its investment in the capital stock of MUSA, was a capital loss and not an ordinary loss.

The final issue presented is whether the excess profits tax accrued within the taxable year 1944 may be used to reduce the net income for such year in computing the net operating loss carry-back from the fiscal year 1946 to the fiscal year 1945, under the provisions of section 122 (b) and (d) (6) of the Code. The excess profits tax accrued in the year 1944 was extinguished by reason of a net operating loss carry-back from 1946 to 1944. The facts pertinent to this issue have been stipulated. A similar issue was determined adversely to the taxpayer in *Lewyt Corporation,* 18 T. C. 1245 (on appeal, C. A. 2), and that

holding will be followed here. We are not unmindful that the Court of Claims has held to the contrary in *Olympic Radio & Television* v. *United States*, 110 F. Supp. 600 (certiorari applied for), upon which the petitioner relies. We, however, prefer to follow our own precedent.

Reviewed by the Court.

*Decision will be entered for the respondent.*