THE WHEELER INSULATED WIRE COMPANY, INCORPORATED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 43882. Filed May 21, 1954.

*Peter Miller, Esq.*, for the petitioner.
*James R. McGowan, Esq.*, for the respondent.

OPINION.

MURDOCK, *Judge:* The Commissioner determined that the petitioner is liable as transferee of the Wheeler Insulated Wire Company (hereafter called Connecticut) for deficiencies in its tax consisting of $7,761.62 in income tax, $2,491.43 in declared value excess-profits tax, and $25,873.95 in excess profits tax for the taxable year ended August 31, 1942, and $3,077.59 in excess profits tax for the taxable year ended August 31, 1943. The issues for decision are whether Connecticut sustained a net operating loss in its fiscal year ended August 31, 1944, which may be the basis for a net operating loss deduction for the taxable year ended August 31, 1942, and whether it may carry back an

unused excess profits credit from its fiscal year ended August 31, 1944, to the taxable year ended August 31, 1942, and another from the year ended August 31, 1945, to the taxable year ended August 31, 1943. The facts have been presented by stipulations which are adopted as the findings of fact.

Connecticut filed its returns for the taxable years with the collector of internal revenue for the district of Connecticut.

Connecticut was incorporated in 1909 and engaged in the manufacture of wire and electrical appliances in Bridgeport, Connecticut, until June 1943. The petitioner, then known as Sperry Securities Corporation, acquired all of the stock of Connecticut, consisting of 1,000 shares of $100 par value common stock, on May 28, 1943. The petitioner caused Connecticut to transfer in partial liquidation to the petitioner, upon the surrender for cancellation by the petitioner of 820 shares of Connecticut stock, on June 14, 1943, "as of midnight, May 31, 1943," all of its assets with the exception of cash, accounts receivable, United States Treasury notes, life insurance policies on lives of officers, and the indenture of lease dated April 5, 1943, between Connecticut and Archer C. Wheeler, individually and as a fiduciary, and a trust company as trustee under a will. The agreement and bill of sale transferring the assets from Connecticut to the petitioner provided that Connecticut sublet to the petitioner the premises described in the lease for the balance of its term and upon the same terms and conditions as set forth in the lease, the petitioner agreeing to pay to Connecticut the net rent and to perform all of the obligations of Connecticut under the lease. It was resolved at a stockholders' meeting of Connecticut held on June 8, 1943, that the distribution would "be in partial liquidation of this Corporation." The petitioner, which theretofore had had only two employees, employed the operating personnel of Connecticut on June 1, 1943, and after that date carried on all the manufacturing operations previously carried on by Connecticut at the Bridgeport plant. The petitioner changed its name on June 10, 1943, to The Wheeler Insulated Wire Company, Incorporated.

The assets and liabilities of Connecticut immediately before and after the distribution to the petitioner and at the beginning and end of the fiscal years 1944 and 1945 were as follows:

| | Before distribution | After distribution | August 31 | | |
|---|---|---|---|---|---|
| | | | 1943 | 1944 | 1945 |
| **ASSETS:** | | | | | |
| Inventories | $164,396.05 | | | | |
| Prepaid insurance, rent, and taxes | 4,320.85 | | | | |
| Fixed assets (net) | 97,026.53 | | | | |
| Patents, patterns, and drawings | 2.00 | | | | |
| Cash | 84,255.58 | $84,255.58 | $87,597.86 | $15,458.88 | $13,609.83 |
| U. S. Treasury 1 per cent notes | 1 198,750.00 | 198,750.00 | 198,750.00 | 198,750.00 | 198,750.00 |
| Accounts receivable | 81,658.36 | 81,658.36 | 4,322.41 | 197.36 | .30 |
| Accrued interest on Government notes | 416.67 | 416.67 | 916.65 | 916.67 | 916.67 |
| Cash surrender value of life insurance | 2 2,225.00 | 2,225.00 | 2,225.00 | | |
| Postwar refund of excess profits tax | 5,950.00 | 5,950.00 | 5,950.00 | 6,000.00 | 4,261.60 |
| Totals | $639,001.04 | $373,255.61 | $299,761.92 | $221,322.91 | $217,538.40 |
| **LIABILITIES AND RESERVES:** | | | | | |
| Accounts payable | $35,024.82 | $35,024.82 | $1,999.19 | $1,519.31 | $776.13 |
| Accrued payroll | 12,378.48 | 12,378.48 | | | |
| Accrued taxes other than income tax | 6,753.40 | 6,753.40 | 84,921.41 | 12,475.88 | 15,718.20 |
| Provision for Federal income and excess profits taxes and State income tax | 133,694.82 | 133,694.82 | | | |
| Reserve for contingencies | | | 32,000.00 | 32,000.00 | 32,000.00 |
| Reserve for spools and cases returnable | 31,290.76 | 31,290.76 | 29,064.06 | 21,809.13 | |
| Reserve for post war readjustments | 5,950.00 | 5,950.00 | 5,950.00 | 6,000.00 | 6,000.00 |
| | $225,092.28 | $225,092.28 | $153,934.66 | $73,804.32 | $54,484.33 |
| **CAPITAL AND SURPLUS:** | | | | | |
| Capital stock | $100,000.00 | $18,000.00 | $18,000.00 | $18,000.00 | $18,000.00 |
| Surplus | 313,908.76 | 130,163.33 | 127,827.26 | 129,518.59 | 145,044.07 |
| Totals | $639,001.04 | $373,255.61 | $299,761.92 | $221,322.91 | $217,538.40 |

¹ These were United States Treasury notes due March 15, 1946, in the face amount of $200,000, purchased July 27, 1942.

² Insurance on lives of officers, face value $25,000 plus additional $25,000 in event of death within 20 years from Jan. 25, 1937.

Sperry Gyroscope Company, Inc., owned 57 per cent and the Sperry Corporation owned 43 per cent of the stock of the petitioner on May 28, 1943, at which time all of the stock of the Sperry Gyroscope Company, Inc., was owned by the Sperry Corporation. The latter, prior to 1947, was primarily a holding company but in 1947 it undertook to simplify its corporate structure and increase the business efficiency of itself and its subsidiaries. One of the first steps taken to accomplish this purpose was to liquidate completely and terminate the existence of Connecticut in July 1947. It was resolved at a stockholders' meeting of Connecticut on June 30, 1947, to amend its certificate of incorporation to terminate the corporation on July 2, 1947, and pursuant to that resolution all of its remaining assets were transferred in complete liquidation to the petitioner in exchange for the remaining 180 shares of Connecticut's stock which were then canceled. The assets transferred to the petitioner at that time consisted of $14,577.87 in cash, $200,253.47 in obligations of the United States, and

$891.67 of accrued interest receivable subject to $785.50 of accounts payable, $10,377.05 of accrued taxes, and $17,000 of reserve for contingencies.

Connecticut reported as income for its fiscal year ended August 31, 1944, interest of $2,000.02 on the United States Treasury notes and $562.19 recovered on bad debts and claimed deductions of $14.44 for interest, $436 for Federal capital stock tax and Connecticut State franchise tax, $65 for legal and collection expense, and $2 fee for filing and $3 for a certified copy of an annual report.

Connecticut reported as income for its fiscal year ended August 31, 1945, $2,000 interest on the United States Treasury notes and $19,532.16 representing unclaimed deposits on spools and cases and claimed deductions of $690.73 for capital stock and State franchise taxes, $50 for accounting fees, and $5 for Connecticut filing fee.

The petitioner concedes that it is liable as a transferee for any deficiencies due from Connecticut for the taxable years.

The petitioner contends that the excess profits tax of Connecticut for its fiscal year ended August 31, 1943, which it paid in its fiscal year ended August 31, 1944, may be considered as a deduction in computing a net operating loss for the latter year which it can then carry back to the taxable year ended August 31, 1942. It is on an accrual basis and the taxes referred to accrued in and were deductible for the year ended August 31, 1943. *Lewyt Corporation*, 18 T. C. 1245, 1253; *Hunter Manufacturing Corporation*, 21 T. C. 424. The Court is not disposed to reconsider those cases as urged by the petitioner, which concedes that they are in point.

The other issue for decision is whether Connecticut is entitled to carry back unused excess profits credits from its fiscal years ended August 31, 1944, and August 31, 1945, under the provisions of section 710 (c). The intention of Congress in enacting those provisions was to allow a low income year of a business to reduce the income and taxes of a high income year of the same business, provided they occurred within the stated time limit, where otherwise the excess profits taxes of the business might be quite uneven. It had no reason or desire to permit the avoidance of excess profits tax on a consistently profitable business where a parent corporation merely shifted the business from one subsidiary to another.

The stipulated facts indicate that Connecticut would have prospered had it gone on conducting its business through the war years of 1944 and 1945 and would have had no unused excess profits credits to carry back from those years to the taxable fiscal years 1942 and 1943. However, it was but an instrument of Sperry Corporation after May 28, 1943, and its business assets, at least all that were necessary, and its business were transferred to the petitioner, another subsidiary of

Sperry Corporation, and used successfully by the petitioner during 1944 and 1945 to earn income which was offset by excess profits credits based upon invested capital to which the petitioner was entitled. This transfer left Connecticut with no business, no substantial income and no excess profits net income during its fiscal years 1944 and 1945 so that any excess profits credits to which it would be entitled during these years would be unused and available for carry-back purposes. Thus the parent would apply two sets of excess profits credits to the same business during the periods here involved where but one set would have been available had it allowed Connecticut to continue its business.

Congress did not intend to bring about any such result. The legislative history of section 710 (c) is tied in with that of sections 23 (s) and 122. They are all designed to give relief in "hardship cases." See the discussion in *Diamond A Cattle Co.*, 21 T. C. 1, 7, *et seq.* Congress intended the excess profits credits to be carried back in cases where the earnings of a business fell off in a later year and the credit was more than sufficient to offset those earnings. Here it became available not because the earnings of the business fell off during the fiscal years 1944 and 1945 but because those earnings during those years belonged to a different corporation to which the parent had transferred the business. Connecticut had nothing to do with the operation of that business after June 1943. The purpose for the continued existence of Connecticut after the end of its fiscal year on August 31, 1943, is not clear. Its assets at that time, other than cash and United States Treasury notes, were relatively insignificant. Neither those assets nor its then liabilities required its continuation and all assets subject to its liabilities could have been distributed to the petitioner, its sole stockholder. Congress had no reason or intention to allow a corporation thus denuded of its business and business assets to carry back unused excess profits credits to earlier years, during which it had excess profits net income from its business, while that business continued to earn excess profits net income in the hands of a related corporation. Section 710 (c) should not be interpreted to give relief where the conditions and the reasons for relief which Congress had in mind do not exist. *Diamond A Cattle Co., supra,* and cases there cited.

Cases involving the question of whether earnings of a taxable year are to be annualized for the purpose of computing the excess profits tax for that year are not in point. The case of *Coca-Cola Bottling Co. of Sacramento, Ltd.,* 19 T. C. 282, is distinguishable on its facts. Cases are cited in which a carry-back of an unused excess profits credit was allowed from a year in which a corporation was engaged in a normal liquidation of its remaining assets after having sold all of its

operating assets at arm's length but in those cases there was no duplication of the excess profits credit such as is being claimed here. Cf. *Wier Long Leaf Lumber Co.* v. *Commissioner*, 173 F. 2d 549, affirming in part and reversing in part 9 T. C. 990; *Whitney Manufacturing Co.*, 14 T. C. 1217; *Bowman* v. *Glenn*, 84 F. Supp. 200, affd. 184 F. 2d 670; *Eastern Grain Elevator Corp.* v. *McGowan*, 95 F. Supp. 40; *Justice Motor Corporation* v. *McGowan*, 97 F. Supp. 570; *Westover Co.* v. *Smyth*, 99 F. Supp. 488. Perhaps the cases most nearly in point are those in which no carry-back of an unused excess profits credit was allowed for a year in which a corporation which had previously disposed of its operating assets had only a de facto existence. Cf. *Wier Long Leaf Lumber Co.*, *supra; Rite-Way Products, Inc.*, 12 T. C. 475; *Gorman Lumber Sales Co.*, 12 T. C. 1184; *Winter & Co.* *(Indiana)*, 13 T. C. 108; *A B C Brewing Corp.*, 20 T. C. 515, 526. The activities of Connecticut during its fiscal years 1944 and 1945 were not those of a corporation engaged either in business or in the normal liquidation of its remaining assets. These are additional reasons why it should not carry back any unused excess profits credits from those years.

Reviewed by the Court.

*Decision will be entered for the respondent.*

Arundell, *J.*, dissents.