966

ROESER & PENDLETON, INC., TRANSFEREE OF PART OF ASSETS OF M-B-K DRILLING COMPANY, INC., DISSOLVED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

M-B-K DRILLING CO., INC., DISSOLVED, WILLIAM T. PAYNE, TRUSTEE, D. A. MCGEE, TRUSTEE, CHARLES F. ROESER, TRUSTEE, C/O KERR-MCGEE OIL INDUSTRIES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

KERR-MCGEE OIL INDUSTRIES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

BIG CHIEF DRILLING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 23710, 23759, 23760, 23761.    Promulgated December 29, 1950.

*C. D. Ellison, Esq.*, and *W. Leo Austin, Esq.*, for the petitioners.
*D. L. Bergeron, Esq.*, for the respondent.

## OPINION.

DISNEY, *Judge:* This case involves excess profits taxes of M-B-K Drilling Co. for its fiscal year ending June 30, 1945, in the amount of $37,120.21 and income tax for its fiscal year ending June 30, 1946, in the amount of $5,192.03. After concessions made, and admission of transferee liability by Roeser & Pendleton, Inc., Kerr-McGee Oil Industries, Inc., and Big Chief Drilling Co., there remain for our

consideration only two questions: (a) Whether $31,060.43 received by M-B-K Drilling Co., in a compromise on June 17, 1945, is long term capital gain as contended by petitioner or ordinary income as determined by the respondent; and (b) whether M-B-K Drilling Co. was a taxable corporate entity from February 28, 1946, to June 30, 1946 (period between date of a resolution to liquidate and dissolve, and the end of the fiscal year), so as to get the benefit of the full amount of unused excess profits credit for the year ended June 30, 1946, in arriving at its excess profits tax for the previous fiscal year ending June 30, 1945. All facts have been stipulated and are found as so stipulated. Only such portions thereof as it is considered necessary to state for purposes of discussion will be set forth herein.

For purposes of clarity the two questions will be taken up separately and the facts as to each set forth, followed by opinion thereon, except for brief statement of general facts applying to both questions.

The petitioner M-B-K Drilling Co. (hereinafter sometimes called petitioner) was until dissolution on October 31, 1947, a corporation organized under the laws of Delaware with its principal place of business now in Oklahoma City and was engaged in oil well drilling operations and crude oil production. It kept its books and filed its income tax returns on the accrual basis and on the basis of fiscal years ending June 30 of each year. It filed its corporation income and excess profits tax returns for the taxable years here involved with the collector of internal revenue for the collection district of Oklahoma.

(a) The pertinent facts with reference to the first question, whether M-B-K Drilling Co. (hereinafter called M-B-K) had ordinary income or capital gain from receipt of the $31,060.43 on June 17, 1945, are as follows:

On June 20, 1939, M-B-K as "Contractor" and York & Harper, Inc., as "Operator" entered into a contract in writing providing so far as considered material here that M-B-K would drill wells upon a lease belonging to York & Harper, Inc., and would be paid at the completion of each well "at the prevailing rate in the field at the date of such completion for similar work performed by independent contractor," in the following manner: At the completion of each well M-B-K would be paid for its actual cash outlay, all items of actual cash expense incurred in the drilling of the well; the difference between the contract price of each well, that is, at the prevailing rate for similar work performed by independent contractors, and the actual cash outlay would be "set up on the books of Operator as a Deferred Account Payable to be paid by Operator to Contractor after the properties above have been fully developed   *   *   *" and when the

properties had been fully paid out the difference between the contract price and the actual cash cost to contractor of all wells then drilled would be paid to M-B-K "in a series of monthly payments, each such payment to be in an amount not less than fifty percent of Operator's net income from the four leases above described, the first of such payments to be made the 20th day of the first month following the complete payout of the properties and a similar payment to be made the 20th day of each month thereafter until Operator's account payable to Contractor is fully discharged." About June 30, 1940, M-B-K had completed its obligations under the contract and had set up on its books an item of $124,241.72 upon a ledger sheet bearing the heading "York and Harper, Inc., Bagley, Foster 'B' and Foster 'D' Leases Drilling Contracts Receivable Out of Oil." Seven journal vouchers of M-B-K, under date of December 31, 1939, credit accounts receivable with various amounts as to the York and Harper, Foster "B" and "D" leases, or Bagley, Foster "B" and "D" leases with corresponding entries under "debit." Three credit items use the expression "Receivable Out of Oil" and four make no reference to oil. Three debit items refer to "Receivable Out of Oil" and four make no reference to oil. Journal vouchers referring to York and Harper, dated January 31, 1940, April 30, 1940, and April 30, 1940, make no reference to payment from oil. A journal voucher dated June 30, 1943, recites a debit item as to York and Harper "Accounts payable solely out of oil" and another journal entry dated July 31, 1945, under credit accounts payable, recites "Accounts Payable Solely Out of Oil—York & Harper, Inc." The $124,241.72 was not included in taxable income for the fiscal year ending June 30, 1940. M-B-K's return for that period made reference to $109,157.65 as "Deferred Profit on drilling contracts."[1] Prior to May 17, 1945, controversies had arisen between M-B-K and York and Harper, Inc., over the rights to M-B-K to sums due not only under the contract of June 20, 1939, but also under other drilling and operating contracts between the two parties. On May 17, 1945, an agreement was entered into between them referring to several contracts, including the one of June 20, 1939, between York and Harper and M-B-K. The contract refers to certain controversies and differences of opinion and states that the memorandum is entered into for the purpose of evidencing the agreements of the parties "relative to those matters of construction and interpretation heretofore in issue." After disposing under separate headings of various matters, the contract under the heading "Deferred Account" recites that "in order to settle the controversy and dispute that has heretofore arisen with reference to the time of payment and the amount of moneys due M-B-K * * *" [under the contract of June 20, 1939] it is agreed

[1] The deficiency notice increased the amount to $111,214.97.

that on or about July 20, 1945, "all the terms as to time when M-B-K * * * would be entitled to the deferred account will have been met, and York & Harper, Inc., will on July 20, 1945, pay to M-B-K * * * $31,060.43 in full settlement of all rights, claims or demands of M-B-K * * *" under that portion of the contract of June 20, 1939, referring to drilling the wells.

On or about July 20, 1945, the $31,060.43 was paid.

Under the above facts the Commissioner in the deficiency notice for the year ending June 30, 1945, added the $31,060.43 to income explaining that the amount, received in settlement of the balance due under the drilling contract of June 20, 1939, though reported as long term capital gain was determined to be ordinary income, inasmuch as the payment was not restricted to the income derived from oil and gas production.

Under the above facts, we must decide whether the $31,060.43 was ordinary income or capital gain. The petitioner contends, in substance, that the issue will be answered by the determination whether M-B-K under the contract of June 20, 1939, acquired an economic interest in oil, and argues that the contract of June 20, 1939, having provided for monthly payments in an amount not less than 50 per cent of York and Harper's "net income from the four leases above described," there would be no payments due if there was no production, and that M-B-K had an economic interest in the oil.[2] It is said that if the contract is ambiguous, the treatment accorded to it on the records of M-B-K is indicative in that the ledger sheet and the several journal vouchers, also the return for 1940, referred to payment from oil, and that the Commissioner in his deficiency notice for the fiscal year ending June 30, 1940, refers to the taxpayer's elimination of "Deferred Oil Payments" from taxable income in the amount of $109,157.65, and determined that the amount was understated and should have been $111,214.97, resulting in an adjustment. M-B-K cites and quotes at length from *Burton-Sutton Oil Co.* v. *Commissioner*, 328 U. S. 25, and *Thomas* v. *Perkins*, 301 U. S. 655.

The respondent, in substance, argues that the $124,241.72 was a mere deferred account payable and not an economic interest in oil, that the petitioner did not report it as income in its return for the fiscal year ending June 30, 1940, that the settlement for $31,060.43 in May 1945, paid about July 20, 1945, resulted in no sale or exchange under section 117 (j), and that there was no economic interest on the part of M-B K which had no capital interest in the lease upon which the drilling was done but was merely entitled to collect on its open

---

[2] M-B-K also points to a provision of the contract of June 20, 1939, which states that M-B-K is to handle the operation of the wells "free of all cost to operate," but this provision refers to the operation of the wells and not to the cost of drilling. The contract elsewhere provides for payment for operation. We find in this provision nothing to support M-B-K's contention.

account as any other creditor of York and Harper, Inc.; that therefore the agreement of May 17, 1945, was merely a commutation of the liability, for 25 per cent, of $124,241.72. Respondent cites, among other cases, *Anderson* v. *Helvering*, 310 U. S. 404.

Neither party has cited a case on all fours with this one. We consider here a contract which provides that M-B-K should drill wells and be paid therefor at the prevailing rate for similar work done by independent contractors, that certain out-of-pocket expenses should be paid upon completion of each well, and that the difference between that amount and M-B-K's actual cost should be set up on the operator's books "as a Deferred Account Payable", to be paid after all other expenses of the property had been recovered by the operator, in a series of monthly payments each "in an amount not less than fifty per cent of Operator's net income" from the leases involved. It is obvious that these provisions do not in words provide for payment solely out of oil or the proceeds thereof or even out of oil or oil proceeds, without "solely"; but that each monthly payment is merely to be *in an amount* not less than 50 per cent of operator's *net income* from the four leases described. Though M-B-K argues that the amount was set up on its ledger, and referred to in some but not all of its journal vouchers referring to that account, as payable from oil, and that it so referred in its return, we note that this is in the nature of self-serving evidence, not to be given much weight as interpretation of contract by parties. Self-serving statements in corporate books have been held to be inadmissible in support of corporate claims. Jones on Evidence, 2nd Ed., Vol. 4, Par. 1735. The fact that the Commissioner did not in determining the deficiency for the fiscal year ending June 30, 1940, discover the contention he now raises is evidential but of little weight. Passing to the authorities cited, the *Burton-Sutton* case does not by any means, in our opinion, indicate that the petitioner here acquired an economic interest. The petitioner there had had an interest in the land and made a contract which the Court considered as a reservation of an interest therein so far as the oil and gas is concerned. The petitioner here had had no interest prior to June 20, 1939, therefore nothing to reserve. In the *Burton-Sutton* case, moreover, the contract involved required the grantee, the taxpayer, to pay the grantor "50% of the proceeds of the oil produced and sold from the land." The Court concludes that: "Through retention of certain rights to payments from oil or its proceeds in himself, each of these assignors of partial exploitation rights in oil lands has maintained a capital investment or economic interest in the oil or its proceeds." Here M-B-K had a mere right to be paid monthly an amount not less than 50 per cent of the net income from the leases. Moreover, M-B-K had drilled wells for which it was to be paid the prevailing rate in the field and the monthly payments were to be con-

tinued "until Operator's account payable to Contractor is fully dis-charged." We do not see in this situation that the petitioner was limited to payment solely from oil or its proceeds. It is not reasonable to believe that the petitioner would have drilled for the usual rate prevailing in the field and at the same time have taken a chance on oil production for its payment. We have no doubt that had there been intent to take such a chance, the drilling price would have been more than the usual rate. Though there were to be monthly payments deferred until the "payout" of the properties of the operator, there was provision for continuation of payments until the "account payable" was "fully discharged," from which we believe that the principal thought involved was the deferment of liability until the operator's other costs were fully paid out and that in the absence of any provision that payment should be limited to the oil or proceeds, M-B-K would have had a right to a reasonable monthly payment even after oil production had ceased, until the account was paid up. *Thomas v. Perkins, supra,* cited by the petitioner was a case involving an assignment of oil and gas leases in consideration of a small amount of cash and an additional sum of $395,000 "to be paid out of the oil produced and saved from the  *  *  * lands, and to be one-fourth of all the oil produced and saved  *  *  * until the full sum  *  *  * is paid  *  *  *." The assignment further recites that the oil payment is to be "out of the oil produced and saved from" the leased premises, payments to be one-fourth "of all the oil produced and saved from the above described land  *  *  *"; also that the $395,000 "is payable out of oil only, if, as and when produced from said lands  *  *  *, and said oil payment does not constitute and shall not be a personal obligation of the assignee  *  *  *."

The Court refers to the provision "for payment to assignors in oil only" and to the "absence of any obligation of the assignee to pay in oil or in money." It is clear, we think, that the case is no basis here for M-B-K's contentions. In *Anderson* v. *Helvering, supra,* the Supreme Court says: "In the interests of a workable rule, *Thomas* v. *Perkins* must not be extended beyond the situation in which, as a matter of substance, without regard to formalities of conveyancing, the reserved payments are to be derived solely from the production of oil and gas." In *Anderson* v. *Helvering,* the taxpayer purchased a royalty interest, fee interest, and deferred oil payments for $160,000 payable $50,000 in cash and $110,000 from one-half of proceeds received by the taxpayer which might be derived from oil and gas produced from the properties purchased and from sale of fee title in the land conveyed. The agreement further provided that the proceeds from sales were to be paid directly to the taxpayer who was to deposit one-half of them at a designated bank to the seller's credit. The seller reserved a lien only upon oil and gas production. The

Court held that the proceeds from the production and sale of oil from the purchased properties received by the taxpayer and paid over to the extent of one-half to the seller, should be included in the gross income of the taxpayer. In so holding the Court reviews the cases, points out that the holder of a royalty interest—that is, a right to receive a specified percentage of all oil and gas produced—is deemed to have an economic interest in the oil in place, which is depleted by severence, but that a share in the net profits derived from development and operation does not entitle the holder to a depletion allowance "even though continued production is essential to the realization of such profits"; that the taxpayer in that case was "not dependent entirely upon the production of oil for the deferred payments," which provision was "similar to the reservation in a lease of oil payment rights together with a personal guarantee by the lessee that such payments shall at all events equal the specified sum" though "In either case, it is true, some of the payments received may come directly out of the oil produced." Though the Court considered that the economic consequences of the transaction are not materially affected by the circumstance that the provision for oil payments is not phrased in terms of a reservation of an interest in the oil and gas in place and that the fact of payments in cash rather than directly in oil is of no moment, it concluded that the deferred payments made by petitioner must be treated as payments received upon a sale and taxable to the petitioner. For like reasons, we consider the deferred payments here involved as not indicative of an economic interest in the petitioner M-B-K. There is, of course, no reservation, and without regard to formalities of conveyancing it can not be said, even as a matter of substance, that the payments "are to be derived solely from the production of oil and gas," the requirement set by *Anderson* v. *Helvering*. To hold otherwise would be, contrary to that case, to extend *Thomas* v. *Perkins*. A case in part similar in facts to this one is *R. T. Myers*, 11 T. C. 495, where the petitioner drilled wells in consideration of $13,000, each payable out of a certain percentage "of the gross production from the four oil and/or gas wells drilled under this contract." We held that there was a depletable interest. It is to be noted that here the payments were not to be out of gross production from the wells drilled but monthly payments were gauged by the net income from the lease.

*Refiners Production Co.*, 43 B. T. A. 481, involved in part a petitioner who acquired working interests in an oil and gas lease and, as consideration for drilling of a well, assigned an undivided fractional interest payable in oil as and when produced. We held that the proceeds of the interest assigned were not taxable to the petitioner. It is plain that the payment was out of oil, therefore involved an

economic interest in the oil. The petitioner therein also agreed to pay, in part for the assignment of a lease to it, the sum of $15,000 from the proceeds from the sale of one-fourth of seven-eighths of the oil produced. Later, however, this was changed and "in lieu of such payment out of oil" petitioner agreed to deliver fuel oil "equal in value to the said one-fourth (¼th) of seven-eighths (⅞ths) of the oil produced." We held that the payee of the $15,000 in the above manner had no interest in the oil production, after the change of contract, though payment was "measured by the daily gross production of the well." We stated that the vendor was not required to look to production from the lease for payment, and petitioner was not required to purchase fuel oil out of the proceeds from such production. "It could have discharged this obligation by the use for that purpose of any funds available to it." So here it is obvious, we think, that York and Harper could have paid the petitioner out of any funds available to it and that the monthly payments while there was oil production would be merely measured thereby.

It is noteworthy also that there is no indication in the record that the petitioners returned payments as they were received and claimed depletion based thereon, consistent with the present contention of economic interest; and since all facts were stipulated it is apparent, and we assume, that such return of income and claim of depletion was not made. We conclude and hold that the petitioner did not acquire an economic interest in the oil involved. Since the $31,060.43 received on compromise in May 1945 is to be considered as the same nature as the right compromised, *Lyeth* v. *Hoey*, 305 U. S. 188; *Margery K. Megargel*, 3 T. C. 238, it follows that the receipt of the $31,060.43 did not represent capital gain but ordinary income.

(b) We next consider whether M-B-K was a taxable corporate entity from February 28, 1946, to June 30, 1946, and therefore entitled to benefit of the full amount of unused excess profits credit for its fiscal year ending June 30, 1946, in arriving at excess profits credit for the fiscal year ending June 30, 1945.

The stipulated facts considered necessary of statements here, on this question, are as follows: On February 28, 1946, the stockholders of M-B-K, that is, Big Chief Drilling Co., Kerr-McGee Oil Industries, Inc., and Roeser & Pendleton, Inc., adopted a plan of liquidation, in a special meeting of stockholders. It was resolved that in order to place the corporation in a financial position to retire forthwith all of its outstanding debts and obligations now due, or shortly to mature, the stockholders should contribute and pay over as a contribution to capital a total of $500,000, ratably as stock was held, whereupon the officers and directors should be authorized and directed to pay said debts forthwith; that M-B-K should "forthwith cease the transaction

of all its business, other than that incident to the winding up of its affairs" and should "in no event enter into any new or additional contracts for the drillings of wells, or make contracts with respect to any new ventures; provided, however, that incident to the winding up of the affairs of such company, such corporation shall proceed with diligence to complete the drilling contracts which it now has in progress"; that a liquidating dividend in cancellation and redemption of 90 per cent of the capital stock should be distributed in kind to the stockholders, covering certain described assets (comprising approximately 80 per cent of the corporate assets); that M-B-K should at the earliest possible date and in any event by October 1, 1946, completely wind up its affairs and distribute all of the balance of its assets ratably; that in connection therewith the corporation should at the earliest possible time complete the drilling of the wells in progress, collect and realize upon all of its assets, pay all of its liabilities, and forthwith distribute ratably to its stockholders all the remaining assets "whereupon all of the stockholders shall, and they do hereby, consent, in writing, to a dissolution of the corporation, and hereby direct that such steps shall thereupon be taken as may be required to file such consent in the office of the Secretary of State" and cause M-B-K to be dissolved. Pursuant to such resolution, liquidating distributions were made in amounts and on dates as follows: On February 28, 1946, $1,048,488.80 (in miscellaneous assets); on May 31, 1946, cash $45,000; on July 20, 1946, cash $30,000; on October 16, 1947, cash and miscellaneous assets $12,951.62. After March 1, 1946, and before March 15, 1946, M-B-K completed three drilling contracts, receiving thereon a total of $31,103.05 on March 31, 1946, based on billings made on or after March 1, 1946. After February 28, 1946, M-B-K paid $7,935.19 wages to drilling crews for March, and during April and May paid $1,750 to a drilling superintendent; it also paid a total of $1,522.50 for other wages during March and April. Drilling operations had, however, already ceased on March 15, 1946. During March, April, May, and June 1946 M-B-K collected a total of $172,025.12, which amount with the exception of the $31,103.05 (from the three drilling contracts above) in large measure represented charges made prior to February 28, 1946. On June 30, 1946, there was due M-B-K, as shown by its balance sheet, $22,710.47 from the collector of internal revenue representing a tentative allowance of an unused excess profits credit carry-back to the fiscal year ending June 30, 1945. Of such amount $3,370.60 was refunded and the balance, $19,339.87, was an abatement of a portion of the original excess profits tax assessment for the fiscal year ended June 30, 1945. There was also on June 30, 1946, due to M-B-K, as shown by its balance sheet, $5,204.15 from the collector of internal revenue representing net overassessment of taxes for

the fiscal years ending June 30, 1942, to June 30, 1945. The balance sheet of M-B-K at June 30, 1946, also showed cash of $40,188.18 and accounts receivable of $15,625.26, with liabilities (aside from net worth) as follows: Accounts payable $7,856.33; due to collector of internal revenue $29,283.15; and on June 30, 1947, the balance sheet showed assets of cash $12,345.42 and accounts receivable $3,714.22, with no liabilities. After the distribution on October 16, 1947, the only asset on hand was cash in the sum of $2,952.50. The corporation was dissolved on October 31, 1947.

Under the above facts, the respondent in the deficiency notice determined that substantially all assets of M-B-K were distributed on February 28, 1946, that for the remainder of the taxable year ended June 30, 1946, the principal corporate activity was liquidation of other assets, and that, therefore, for excess profits tax purposes the income, $36,502.66, was applicable to the period from July 1, 1945, to February 28, 1946, or 243 days, and that the amount should be annualized in the computation of allowable excess profits credit carry-back to the year ended June 30, 1945.

Upon brief, in support of such determination, the respondent cites only *Wier Long Leaf Lumber Co.* v. *Commissioner*, 173 Fed. (2d) 549, affirming in part and reversing in part 9 T. C. 990. The petitioner cites *Union Bus Terminal, Inc.*, 12 T. C. 197, affd., 179 Fed. (2d) 399: *Allegheny Broadcasting Corp.*, 12 T. C. 552, affd., 179 Fed. (2d) 844; and *United States* v. *Kingman*, 170 Fed. (2d) 408. In our opinion, the *Wier Long Leaf Lumber Co.* case does not sustain the respondent's position. It holds that the fact that a corporation is in liquidation does not preclude it from being held a corporation within the meaning of the statute, section 710 (c) (3) (A) of the Internal Revenue Code, providing for unused excess profits tax credit carry-backs, and though it held that if a liquidating corporation is one in name and substance only, without corporate substance, and serving no real corporate purpose, it should, though not formally dissolved, be treated as dissolved *de facto;* nevertheless, in that case, as to 1943, as to which it was held that petitioner was entitled to a carry-back, it was found that the petitioner started the year with assets of nearly $1,000,000, including $100,000 accounts receivable, that its liquidation had just begun, and that it was in form and fact a corporation winding up its business and making some, though small, profits. It was held that it was a going corporation for the whole of that year. As to 1944 the excess profits credit carry-back was denied because by the end of 1943 the liquidation had so far progressed that there was no longer valid reason for delaying dissolution. In the instant case, in our opinion, there was even more business activity during the period from February 28, 1946, to June 30, 1946, than appears in the

*Wier Long Leaf* case during 1943. The petitioner drilled three wells, received payment therefor, paid and incurred expenses to the extent of approximately $11,500, and collected about $172,000, including about $31,000 for the drilling of the wells during that period. At the end of the year it had not settled its claims against the collector of internal revenue to the extent of about $28,000. We think this was such business activity as to indicate that the corporation though not formally dissolved until October 31, 1947, was such a corporate entity until June 30, 1946, as to preclude annualization of its income for that period for the purpose of the excess profits credit carry-back. *United States v. Kingman, supra,* in our opinion, indicates the proper view here, for there the stockholders on April 3, 1943, had passed a resolution that the corporation immediately go into liquidation, just as was done in this case. The corporation continued in existence during the rest of the year and had not at time of opinion yet been dissolved. Although the only business done seems to have been the pressing of claims to a tax refund of $26,778 and for postwar maturing bonds in the sum of $2,667.90, with a possibility of the amount being larger, the Court concluded that the corporation continued in existence, did not dissolve, and retained valuable claims to United States bonds and tax refunds throughout the year and, therefore, correctly made its returns on a 12 months' basis, so that the Commissioner erred in annualizing credit against excess profits taxes under section 711 (a) (3). The Court points out that Regulations 111, section 29.52–1 on this subject provides that a corporation *having an existing* during any portion of a taxable year is required to make a return, and that: "A corporation is not in existence after it ceases business and dissolves, retaining no assets. \* \* \* If the corporation has valuable claims for which it will bring suit during this period (i. e., after actual dissolution) it has retained assets and it continues in existence." The Court concludes that under the regulation a corporation does not go out of existence "unless it ceases business, dissolves and retains no valuable claims on which it may sue after dissolution," also that under Regulations 112, section 35.711–(a) 4 there is a short taxable year if the period from the beginning of its last accounting period "to the date it ceases operations and is dissolved, retaining no assets, is a period of less than twelve months." In our view, the corporation here continued in existence and retained assets throughout the fiscal year, and the Commissioner erred in applying annualization under the principles of the *Kingman* case. See also *Union Bus Terminal, Inc.,* and *Allegheny Broadcasting Corp., supra.*

*Decisions will be entered under Rule 50.*