THE DIAMOND A CATTLE COMPANY, PETITIONER, *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7352.   Promulgated October 9, 1953.

*M. T. Woods, Esq.,* and *W. Clayton Carpenter, Esq.,* for the
petitioner.

*Marvin E. Hagen, Esq.,* and *Gene W. Reardon, Esq.,* for the
respondent.

1

4

OPINION.

MURDOCK, *Judge:* The Commissioner has held that the accounting method used by the petitioner prior to and during the taxable years is an accrual method but the petitioner failed to adhere to that method in that it did not accrue several items which the Commissioner has adjusted to an accrual method in determining the deficiency. The petitioner, to support its contention that it has never used an accrual method, should show that its method is not an accrual method, or, at least, that in the majority of the most substantial items of income and deductions it is not an accrual method. *Hygienic Products Co.*, 37 B. T. A. 202, affd. 111 F. 2d 330, certiorari denied 311 U. S. 665; *Estate of Julius I. Byrne*, 16 T. C. 1234, 1246; *Schuman Carriage Co.*,

*Ltd.*, 43 B. T. A. 880; *Aluminum Castings Co.* v. *Routzahn*, 282 U. S. 92. This is not a case in which the Commissioner has attempted to change a long established and consistently used method of accounting on the ground that it does not clearly reflect income or on any other ground. Instead he has merely insisted, as the law and regulations require, that the petitioner consistently follow the method of its choice, i. e., an accrual method, with respect to several substantial items which would have to be accrued under any proper accrual method. See cases cited above.

The evidence not only fails to show that the petitioner regularly used some acceptable method other than an accrual method but affirmatively supports the determination of the Commissioner that an accrual method was used. The unit-livestock-price method of inventorying animals had long been used by the petitioner and is generally, and now by the Commissioner, recognized as a proper inventory method. It is a part of an accrual method of accounting. The raising and selling of livestock was the business and almost the sole source of the income of the petitioner. The petitioner inventoried its livestock at all times prior to and during the taxable years and, in so accounting, accrued and reported large amounts of income not received, representing to some extent the increase and growth of the animals in its herds prior to sale of those particular animals. In other words, it has used an accrual method of accounting for its chief activity. Cf. *Herberger* v. *Commissioner*, 195 F. 2d 293, certiorari denied 344 U. S. 820; *A. & A. Tool & Supply Co.* v. *Commissioner*, 182 F. 2d 300; *Stern Brothers & Co.*, 16 T. C. 295, 322; *Wm. Fleischaker, et al.*, 7 B. T. A. 389; *Kabatzinck* v. *Eaton*, 45 F. 2d 244. It has also accrued and reported other income and deductions prior to receipt or payment of cash and did so during the taxable years. It accrued profits on sales made on credit. Its books show accruals of interest carried into income, yet it failed to accrue when due the interest which the Commissioner has held nondeductible in the taxable years. It also had on its books accounts receivable and accounts payable which may not have affected income. The accounting for some cash transactions is much the same regardless of whether the taxpayers use an accrual or a cash method of accounting. These can include payroll, cash sales and purchases, and perhaps some other items. The petitioner had a number of such items on its books. However, it has not shown that any substantial recurring items were recorded on its books in a manner inconsistent with an accrual method of accounting. It has not shown that it did not accrue some taxes. Testimony of officers and stockholders that an accrual method was not used is unavailing where, as here, other better evidence contradicts their statements of general conclusions. In short, the petitioner has not sustained the burden imposed upon it of showing that the Commissioner erred in disallowing deductions for interest

which accrued in years prior to the years of payment, in holding that Federal taxes accrued in the tax year and were not deductible in the next year when paid, *Lewyt Corporation*, 18 T. C. 1245, contra *Olympic Radio & Television, Inc.* v. *United States*, 108 F. Supp. 109, sustained on rehearing 110 F. Supp. 600, and in holding that the profit from a sale of sheep was income of the year in which the sale was made rather than of a later year. Also it has failed to show that the profit from the sale of cattle accrued in 1943.

The Commissioner now concedes that capital gains resulted from sales of cattle and sheep belonging to the breeding herds but still insists that unbred heifers and ewe lambs were not a part of those breeding herds. The petitioner thus has the burden of proving that the unbred heifers and ewe lambs were a part of the breeding herds and the profit from sales of those animals were long-term capital gains. There is almost no evidence in regard to the ewe lambs and the record does not justify a finding that they were a part of any breeding herd of sheep maintained by the petitioner or that they were held for more than 6 months prior to the sale in question. The petitioner had a dual purpose in holding unbred heifers after inventoring them as yearlings at the end of each year. One purpose was to sell as many of them, beginning with the poorer ones, as might seem desirable in the following year in the light of the then existing conditions such as the quantity of grass available, financial needs of the petitioner, market conditions, the extent to which the breeding herd had been reduced by losses, and other conditions. The other purpose was that some of the better animals would be available as replacements in the breeding herd, when they became 2-year-olds, to the extent that that would seem desirable in the light of some or all of the same conditions that have been mentioned. Cf. *Walter S. Fox*, 16 T. C. 854, affd. 198 F. 2d 719. The unbred heifers were kept separate from the breeding herd. Actually a large percentage of the unbred heifers on hand during each of the taxable years was sold and a fair inference is that a great many were held primarily for sale to customers in the ordinary course of the taxpayer's business. Thus, it cannot be found as to any particular animal that it was being held up to the time of its sale for breeding purposes. The petitioner has failed to show by a fair preponderance of the evidence that the unbred heifers sold were capital assets. The petitioner, relying upon exhibits which it placed in evidence, argues, and in effect concedes, that its gains from the sales of yearling heifers for 1942 and 1943 were somewhat greater than the amounts claimed by the Commissioner. That point, like some others, may be adjusted in the computation under Rule 50.

The petitioner claims the right under sections 23 (s) and 122 to carry back to 1943 an alleged net operating loss of 1945 and under

section 710 (c) (3) to carry back to 1943 an unused excess profits credit for 1945. The decision of these questions does not require consideration of the differences between the parties relating to accounting and tax reporting methods permissible to the petitioner for 1945. The petitioner transferred its assets as a liquidating distribution to its sole stockholder on August 15, 1945. Consequently, its sales of livestock for 1945 amounted to only $878.50, which was not unusual since sales were normally made after August of each year. Its total reported income for 1945 was only $7,245.53. It computes the alleged operating net loss for 1945 by deducting, from that small reported income, all of its operating expenses of 1945 including the substantial amounts paid in carrying its large herds of animals through the first 7½ months of the year, whereas there is reason to believe that there would have been a profit rather than a loss had it completed the cycle by continuing its operations through the usual selling period in the latter part of the year. The petitioner was operating successfully in 1945 with prospects of profits when it voluntarily dissolved and thereby prevented itself from reaping through later sales the usual benefits of its operating expenditures to that date. The liquidation, under which the herd including all growing animals was transferred to the sole stockholder without payment or taxable profit to the corporation, was the cause of the "loss" reported on the 1945 return. Liquidation is the opposite of operation in such a case.

Sections 23 (s), 122, and 710 (c) are relief provisions designed to give relief in "hardship cases." Their legislative history shows that the deduction from income of a profitable year of a net operating loss carry-back from a later year was intended to apply only where a real "economic loss" was actually sustained in the later year. H. Rept. No. 855, 76th Cong., 1st Sess., p. 17 (1939–2 C. B. 504, 517) ; S. Rept. No. 1631, 77th Cong., 2d Sess., p. 51 (1942–2 C. B. 504, 546). Cf. *Central Cuba Sugar Co.*, 198 F. 2d 214, reversing 16 T. C. 882, certiorari denied 344 U. S. 874. Although a literal application of those provisions might give at least some of the benefits which the petitioner here seeks, nevertheless, they should not be applied where there is no hardship, where no occasion for relief exists, and where Congress did not intend them to apply. The Supreme Court said in *United States* v. *American Trucking Associations, Inc.*, 310 U. S. 534, at pages 543 and 544:

There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has lead to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreason-

able one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination."

See also *Vermilya-Brown Co.* v. *Connell*, 335 U. S. 377; *United States* v. *Dickerson*, 310 U. S. 554, 562; *Haggar Co.* v. *Helvering*, 308 U. S. 389; *Gregory* v. *Helvering*, 293 U. S. 465; *Helvering* v. *New York Trust Co.*, 292 U. S. 455; *Mary A. Marsman*, 18 T. C. 1, 12, affirmed in part and reversed in part 205 F. 2d 335. Cf. *Helvering* v. *Owens*, 305 U. S. 468. The petitioner in the present case sustained no economic loss in 1945. If it had any loss for that year, it was merely a tax-return loss created by the stockholder realizing the normal profits from large expenditures made and deducted by the corporation. Furthermore, this is not a hardship case.

To allow any unused excess profits credit of 1945 to be carried back to 1943, under the circumstances of this case, would likewise be contrary to the purpose which Congress had in mind in enacting section 710 (c) (3) as shown by the same legislative history. Congress intended the credit to be carried back only in cases where it was not needed in the tax year to offset normal earnings. Here it is available not because 1945 earnings were low but merely because they were avoided through the liquidation before the normal earning cycle was completed. The petitioner operated its business in the usual fashion up to August 15, 1945, and thereafter completely ceased to operate that business. If the business had been one in which income and expenses more or less paralleled each other from month to month, the case would be somewhat like one or more of those cited by the petitioner and some carry-back of an unused excess profits credit from 1945 might be in order, but the business was not of that kind. Instead, it was a business in which the expenses went on rather uniformly throughout each month of the year but practically all of the income was derived from sales which normally took place after August 15. Thus, this petitioner, which had practically no sales during 1945 (due solely to the fact that it voluntarily distributed its assets in liquidation to its sole stockholder on August 15, 1945, and thereafter the sole stockholder received the proceeds of the normal sales), seeks to carry back to 1943 whatever unused excess profits credit it may have for 1945. It was held in *Wier Long Leaf Lumber Co.* v. *Commissioner*, 173 F. 2d 549, affirming on this point 9 T. C. 990, that a liquidated corporation still in existence could not carry back to a prior year the unused excess profits tax credit of a year during all of which it had been in a state of complete liquidation. See also *Rite-Way Products, Inc.*, 12 T. C. 475; *Gorman Lumber Sales Co.*, 12 T. C. 1184; and *Winter & Co.*, 13 T. C. 108. While those cases

are not directly in point, they may point the way. Here, the petitioner, due to a complete liquidation in 1945, prevented itself from having any of its normal income from sales during that same year and as a result, apparently needs none of its excess profits tax credit for that year. Congress would have no more reason for allowing it to carry back to a prior year the unused credit than it would have for allowing the taxpayers in the four cases just cited to carry back unused excess profits tax credits from years in which they had no operating income.

The Court has no jurisdiction over the year 1945 in this proceeding and cannot consider that year except as it affects the taxable years, so details of the accounting for 1945 need not be considered and it is sufficient to hold that no right to a deduction for 1945 under section 23 (s) or a carry-back under section 710 (c) (3) has been established. The petitioner's argument that inventories for 1943 and 1944 should be reduced because of some proposed adjustment for 1945 has no merit in fact or law.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

RICE, *J.*, dissenting: Petitioner's principal source of income was derived from the production and sale of livestock. Since 1906, it has used the unit-livestock-price method to inventory its livestock, and such inventories have always been used in computing its income in its Federal income tax returns. Petitioner, as I see it, was entitled to use inventories in computing its income and to account for all other items of income and expenses on a cash basis.

Section 22 (c) of the Code provides for the use of inventories in computing gross income. Section 29.22 (a)–7, Treasury Regulations 111, relates to the gross income of farmers, including livestock raisers, and distinguishes between "a farmer reporting on the basis of receipts and disbursements (in which no inventory to determine profits is used)" and "a farmer reporting on the accrual basis (in which an inventory is used to determine profits)." Section 29.22 (c)–6, Treasury Regulations 111, in effect during the taxable years, provided that a livestock raiser or other farmer could change the basis upon which he filed his tax returns from a cash receipts and disbursements method to an inventory method provided certain adjustments were made. This regulation was amended by T. D. 5683, approved December 30, 1948, 1949–1 C. B. 52, and provides that a livestock raiser or other farmer has the option of making his return upon an inventory basis instead of the cash receipts and disbursements basis and, once the option is elected, it is binding upon the taxpayer for subsequent years

unless another method is authorized by the Commissioner. T. D. 5423, 1945 C. B. 70, recognized the "unit-livestock-price method" as a method by which livestock raisers could value their inventories, and amended section 29.22 (c)–6 to read in part as follows:

Because of the difficulty of ascertaining actual cost of livestock and other farm products, farmers who render their returns upon an inventory basis may value their inventories according to the "farm-price method," and farmers raising livestock may value their inventories of animals according to either the "farm-price method" or the "unit-livestock-price method."

\* \* \* \* \* \* \*

The "unit-livestock-price method" provides for the valuation of the different classes of animals in the inventory at a standard unit price for each animal within a class. A livestock raiser electing this method of valuing his animals must adopt a reasonable classification of the animals in his inventory with respect to the age and kind included so that the unit prices assigned to the several classes will reasonably account for the normal costs incurred in producing the animals within such classes. Thus, if a cattle raiser determines that it costs approximately $15 to produce a calf, and $7.50 each year to raise the calf to maturity, his classifications and unit prices would be as follows: calves, $15; yearlings, $22.50; 2-year olds, $30; mature animals, $37.50. The classification selected by the livestock raiser, and the unit prices assigned to the several classes, are subject to approval by the Commissioner upon examination of the taxpayer's return.

A taxpayer who elects to use the "unit-livestock-price method" must apply it to all livestock raised, whether for sale or for breeding, draft, or dairy purposes. Once established, the unit prices and classifications selected by the taxpayer must be consistently applied in all subsequent years in the valuation of livestock inventories. No changes in the classification of animals or unit prices will be made without the approval of the Commissioner.

Section 41 of the Internal Revenue Code [1] provides that income shall be computed in accordance with a method of accounting regularly employed in keeping records of the taxpayer. If such method, however, does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income.

Section 29.41–3, Treasury Regulations 111, relating to methods of accounting, states in part as follows:

METHODS OF ACCOUNTING.—It is recognized that no uniform method of accounting can be prescribed for all taxpayers, and the law contemplates that each taxpayer shall adopt such forms and systems of accounting as are in his judgment best suited to his purpose. \* \* \*

---

[1] SEC. 41. GENERAL RULE.

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year.

Respondent argued that, under the Code and regulations, petitioner's method of reporting income did not clearly reflect its income, and that since it used livestock inventories, it was on an accrual basis. The theory of accrual accounting is that it more accurately offsets items of expense and items of income, but cash-basis accounting is not denied a taxpayer on this ground alone; and, in the case of a livestock raiser or other farmer, an option to use a cash receipts and disbursements method is afforded. The words, "clearly reflect income" appearing in section 41 of the Code, do not mean "accurately" reflect income. *Huntington Securities Corporation* v. *Busey*, 112 F. 2d 368 (C. A. 6, 1940). Respondent's argument in the instant case is more that petitioner's method was "not accurate" than that "it was not clear." Where the use of inventories is mandatory, the regulations provide a party must be on an accrual basis. Regs. 111, sec. 29.41–2. However, because of the option afforded under the regulations, petitioner was not in a business where it "must" use inventories. T. D. 5683, *supra.* It could, but it was not required to do so.

The unit-livestock-price inventory is different from the usual types of inventory. It does not purport to represent cost or to represent market value. By its very definition it is a constant-pricing method, and once the prices for each class are established, such prices cannot be changed without permission of the Commissioner. Such a method of inventorying is obviously different from the usual inventory used by an accrual-basis taxpayer.

While it is true that as a usual rule this Court does not generally recognize a hybrid system of accounting, *Estate of Julius I. Byrne*, 16 T. C. 1234 (1951), it must be remembered that this is because a hybrid method generally does not clearly reflect income. In that case, the Commissioner determined that the corporation, which was before this Court (in consolidated proceedings), was on an accrual basis and adjusted its accounts accordingly. The corporation was a manufacturing corporation, and we held that it had failed to prove that it was predominantly on a cash receipts and disbursements basis, or even that the system which it was using more nearly resembled a cash method and we, therefore, sustained the Commissioner in his determination that petitioner should properly be on an accrual basis and sustained the adjustments which he had made in respect thereto. However, because of the difficulties connected with farm accounting, a number of farmers and livestock raisers use the system employed by petitioner consistently throughout the years. These very accounting difficulties, such as ascertainment of actual costs and the keeping of complete records necessary for an accrual method of reporting income, are the reasons for the optional treatment allowed under the regulations. See 2 Mertens, Law of Federal Income Taxation, sec. 16.33, p. 560.

· Such difficulties were recognized by respondent in his deficiency notice and in his brief. No attempt was made to include certain items, such as feed on hand, and other items which properly should be included either as supplies or inventories, in using an accrual method. Respondent stated in his brief that:

no adjustments were necessary since the evidence disclosed that such items remained relatively constant from year to year and the net income during the taxable years in question would be substantially the same whether such items were reported upon a cash basis or upon the accrual basis. [Page 47.]

In effect, the respondent has, therefore, put petitioner upon a hybrid basis of accounting for income tax purposes. If petitioner's method is a hybrid one, a question arises whether respondent can change petitioner from one hybrid basis of accounting to another, on the ground that his method more clearly reflects petitioner's income than the method which petitioner has been using since 1906. The only major adjustment with respect to this issue which respondent has made is with respect to the interest items paid out by petitioner during the taxable years which, had it been on an accrual basis, would have been deducted in years prior to the years in question. Respondent maintained that to allow such deductions would distort petitioner's income for each of the taxable years involved. Such an argument is true as applied to any taxpayer using a cash basis of accounting.

In *Reynolds Cattle Co.*, 31 B. T. A. 206 (1934), the taxpayer had used a constant-price inventory which the respondent had objected to for the years 1926, 1927, and 1928, and ordered the returns prepared on a cash receipts and disbursements basis. The taxpayer protested the proposed deficiency and the matter was determined, in Washington, by the Commissioner using the inventory basis in closing the case. While the controversy was pending, the taxpayer prepared its 1929 and 1930 returns on the cash receipts and disbursements method. The respondent issued a deficiency notice with respect to those years on the ground that the returns should have been made on the inventory basis because no permission to change the method of accounting had been granted. On appeal to this tribunal, we held that the constant-price method formerly used by the taxpayer and determined by the Commissioner to be applicable to those years did not clearly reflect its income and, therefore, the cash receipts and disbursements method should be used. However, since that case, the respondent, in 1944, recognized the use of the constant-pricing method for valuing livestock, and provided that a taxpayer who, for taxable years beginning prior to January 1, 1944, had used a constant-unit-price method of valuing livestock inventories would be considered as having elected to use the unit-livestock method of valuing inventories.

Respondent's argument that items of accrual appeared on petitioner's books and that, therefore, it was really on an accrual basis has

not convinced me that such was actually the case.   Most of the items so cited by respondent were minor in nature and, in my opinion, were adequately explained by petitioner.   Some accounts on its books carried titles which normally are used for accrual accounting, such as accounts receivable, inventories of livestock, deferred charges, accounts payable, and notes payable.   The record shows that in some instances they were erroneously named and in others were balance sheet, not income, accounts.   Petitioner's returns stated that they were made on a cash receipts and disbursements basis.   This tribunal, in *M. D. Rowe, et al.*, 7 B. T. A. 903 (1927), stated:

The respondent attaches great weight to the presence on the books, of a few accounts, amounting in the aggregate to relatively minor totals, as of the end of each year, which are classified on the balance sheets as "accounts receivable" and relies upon the mere existence of these accounts to show that the method of accounting of the partnership, was on the accrual basis.   He points out that these asset accounts were determinative of net worth and apparently is thus influenced to believe that they entered through the door of income, and being unpaid, the income must have been an accrual.   We think the fact has been overlooked that an account receivable may come into existence and be recorded on books of account, including those kept on a cash basis, without the slightest effect on income.   The petitioners have endeavored to show the nature of every such account and have satisfied us that some of them covered transactions classifiable as loans or accommodation purchases chargeable at cost, and it is obvious that such are not indicative of an accrual of income.   As to other accounts included in the classification, the evidence is not so clear as to enable a satisfactory determination of their relation to income.   In the determination of so comprehensive a question as the method of accounting used, we are averse to drawing a presumption from the general nature of a very few accounts receivable, even where it is unfortunately true that we are left to conjecture how two debits described as "charges in error'" and "disputed charges" were originally entered on the books.   It is in evidence that the partnership never intentionally departed from a cash basis in determining its net income, and we conclude the record as a whole in this particular, supports the contention of the petitioners.   [Pages 908–909.]

Such a statement adequately meets the argument presented in the instant case.   Under such circumstances, I would hold that the method used by petitioner in keeping its books and reporting its income for Federal tax purposes over the years most clearly reflected its income, and respondent erred in changing petitioner's method from one hybrid system to another.

Nor can I subscribe to that portion of the majority opinion which holds that the petitioner is not entitled to carry back to 1943 a net operating loss of 1945 and an unused excess profits credit for 1945. The language of the applicable sections of the Code are clear, and I would not impute to Congress an intent to exclude this petitioner from the statute merely because it liquidated before selling its income-producing assets.   The majority opinion disregards the unambiguous

language of the statute and attempts to justify this by a quotation from *United States* v. *Amer. Trucking Ass'ns.*, 310 U. S. 534 (1940). It is true that the language used by the Supreme Court is very sweeping, but it is followed by the statement that "Obviously there is danger that the courts' conclusion as to legislative purpose will be unconsciously influenced by the judges' own views or by factors not considered by the enacting body." It should be noted that in that case the statutory language the Court was called on to interpret conflicted with the language in another act of Congress; judicial construction was, therefore, required to resolve the conflict; and the Court was justified in looking at the over-all purpose of Congress in enacting the statute in order to give proper effect to the intent of the legislators. That is not true in this case. In a recent opinion of this Court, *Fred MacMurray*, 21 T. C. 15, in construing the application of section 130 of the Code to losses suffered by a husband and wife in a community-property state, we said:

> The statute speaks of the losses 'allowable to an individual', and we are not at liberty to re-write it for citizens of community property states. It may well be that if the attention of Congress had been drawn to the discriminatory operation of the statute in such states, it might have treated the problem differently. The question, however, is a legislative one, and we must apply the statute as we find it. On this issue, our decision must be in favor of the petitioners.

That language, it seems to me, is applicable to the situation here.

We have held that the fact that a corporation is in the process of liquidating during the taxable year does not prevent it from carrying back a net operating loss for such year, since the language of section 122 is not limited to an operating corporation. *Gorman Lumber Sales Co.*, 12 T. C. 1184 (1949).

The record in this case would justify a finding that there were valid business reasons for the dissolution of the petitioner. There is nothing in the Internal Revenue Code which permits the Commissioner to force a taxpayer to dissolve at such a time as would most benefit the Federal Government taxwise. What the end result of the majority holding on these issues will be is difficult to foresee. If the petitioner had dissolved on November 15 or December 15 showing a loss as of either date, would the result be different?

This question is somewhat similar to the question involved in the case of *United States* v. *Kingman*, 170 F. 2d 408 (C. A. 5, 1948), in which it was held that where a corporation was not formally dissolved, it was taxable for income and excess profits tax purposes on a 12-month basis rather than on a short taxable year. Under the latter treatment, it would have been required to annualize its profits under 711 (a) (3) of the Code. Such result was reached on the theory that the taxpayer there retained, among other assets, a claim under section 722 for excess profits tax relief. Such result was held to be the proper

one despite the fact that the stockholders' resolution prevented the directors of the corporation from carrying on any business of the corporation other than those activities necessary for liquidating. Much the same facts exist in the instant case. Here, petitioner has not dissolved to date because of the pendency of this case. It had a 722 claim for relief from excess profits tax which it did not abandon until shortly before the hearing of this case. Here, as in the *Kingman* case, petitioner carried on activities until the date of liquidation. The *Kingman* case has been followed by this Court in *Roeser & Pendleton, Inc.*, 15 T. C. 966 (1950), affd. 196 F. 2d 221 (C. A. 10, 1952). See also the discussion of the *Kingman* case in *Winter & Co.*, (*Indiana*), 13 T. C. 108 (1949). Under such circumstances, I would hold that petitioner was entitled to carry back its net operating loss and its unused excess profits tax credit from the year 1945 to 1943.

---

BLACK, *J.*, concurring in part in Judge Rice's dissent: I concur in Judge Rice's dissenting opinion in so far as it dissents from the majority opinion which denies petitioner the right to carry back its net operating loss for 1945 to 1943, and also denies petitioner's right to carry back its unused excess profits credit in 1945 to 1943. It seems to me that under the language of the applicable statutes which govern these matters the petitioner has the right to carry back its net operating loss in 1945 to reduce taxable income for 1943, and has the right to carry back its unused excess profits credit in 1945 to 1943 and thereby reduce its excess profits tax liability for 1943.

I join with Judge Rice in dissenting from the conclusion reached by the majority opinion on these two points.